**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Case No. 18 CR 48 |
| | : | Judge John Z. Lee |
| v. | : | |
| EDWARD BASES and JOHN PACILIO, | : | |
| Defendants. | : | |

# SENTENCING MEMORANDUM ON BEHALF OF JOHN PACILIO


ORRICK, HERRINGTON & SUTCLIFFE LLP

David H. McGill
James Anglin Flynn
1152 15th Street, NW
Washington, DC 2005

Alyssa Barnard-Yanni
51 West 52nd Street
New York, NY 10019

*Counsel for Defendant John Pacilio*

# TABLE OF CONTENTS

Page


PRELIMINARY STATEMENT .......... 1

RELEVANT BACKGROUND .......... 6

I. John Pacilio .......... 6

II. John's Role in a Transforming Marketplace .......... 9

III. Guidance Available to John During the Relevant Period .......... 11

IV. The Offense Conduct .......... 13

V. The Trial .......... 13

VI. Probation's Presentence Report .......... 14

SENTENCING ANALYSIS .......... 15

I. The Correct Guidelines Range Is Zero-To-Six Months .......... 16

A. The "Relevant Conduct" For Sentencing Consists Only Of The Trial Episodes .......... 17

1. The Government Has Not Proven Fraudulent Intent For The Non-Trial Episodes .......... 18

a. The Government's Four Steps Cannot Reliably Identify Spoofing .......... 19

b. Half Of The Asserted Episodes Do Not Fit The Four Steps .......... 21

2. The Government's Calculations Improperly Incorporate Other Episodes .......... 24

B. The Court Should Reject Dr. Venkataraman's Loss Calculation Methodology And Refuse To Impose Any Loss Enhancement Under § 2B1.1(b) .......... 27

1. The Government Has Not Proven Causation .......... 28

2. At Most, The Court Should Use Gain As A Proxy For Actual Loss .......... 32

3. Intended Loss Is Not A Substitute For Actual Loss .......... 32

4. The Government Uses An Unreliable But-For Price .......... 34

C. The Court Should Reject The Government's Calculations For Lack Of Sufficient Data And Order An Evidentiary Hearing .......... 36

D. No Other Sentencing Enhancements Apply .......... 38

1. The Section 3B1.1 Leadership Enhancement Is Unsupported .......... 38

**TABLE OF CONTENTS**
**(continued)**

**Page**


2. The Section 2B1.1(b)(10) Sophisticated Means Enhancement Is Unsupported ..... 40
3. The Section 2B1.1(b)(7) "10 or More Victims" Enhancement Is Unsupported ..... 42
a. Failure Of Proof In Dr. Venkataraman's Declaration ..... 42
b. Failure Of Proof In The PSR ..... 44
c. Failure Of Proof In Trial Record ..... 45
E. The Applicable Guidelines Range ..... 46
II. A Balanced Consideration Of The Section 3553(a) Factors Supports A Sentence Of Home Confinement ..... 46
A. The Nature and Circumstances Of The Offense Weigh In Favor of Lenience ..... 47
1. Contemporaneous Evidence From 2009-2014 Shows The Status Of Spoofing Was At Least Ambiguous, Reducing Relative Culpability ..... 47
2. The Lack Of Financial Gain Weighs In Favor Of A Non-Custodial Sentence ..... 54
B. John's Personal Characteristics Warrant Lenience ..... 55
1. John Exhibits A Remarkable Generosity Of Spirit, And A Custodial Sentence Would Impose Substantial Burdens On Those Who Depend On Him ..... 55
2. John's Business Associates Know Him To Be Trustworthy And Ethical ..... 58
C. A Non-Custodial Sentence Provides Just Punishment and Adequate Deterrence ..... 59
D. A Sentence Of Home Confinement Is Consistent With Sentences Imposed On Similarly Situated Defendants And Therefore Avoids Unwarranted Sentencing Disparities ..... 61
CONCLUSION ..... 65

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)....29, 30

*Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*,
41 F.4th 71 (2d Cir. 2022)....31

*Gayton v. McCoy*,
593 F.3d 610 (7th Cir. 2010)....37

*Glickenhaus & Co. v. Household Int'l, Inc.*,
787 F.3d 408 (7th Cir. 2015)....30, 31

*Hall v. Quarterman*,
534 F.3d 365 (5th Cir. 2008)....37

*Jastremski v. United States*,
737 F.2d 666 (7th Cir. 1984)....29

*Kisor v. Wilkie*,
139 S. Ct. 2400 (2019)....33

*Koon v. United States*,
518 U.S. 81 (1996)....16

*Kulhawik v. Holder*,
571 F.3d 296 (2d Cir. 2009)....45

*Pepper v. United States*,
562 U.S. 476 (2011)....1, 16

*Proffitt v. Wainwright*,
685 F.2d 1227 (11th Cir. 1982)....37

*Soria v. Ozinga Bros.*,
704 F.2d 990 (7th Cir. 1983)....37

*U.S. Commodity Futures Trading Comm'n v. Wilson*,
27 F. Supp. 3d 517 (S.D.N.Y. 2014)....51, 52

*United States v. Adelson*,
441 F. Supp. 2d 506 (S.D.N.Y. 2006)....56

*United States v. Banks*,
No. 19-3812, -- F.4th --, 2022 WL 17333797 (3d Cir. Nov. 30, 2022)............................33, 34

*United States v. Bischel*,
61 F.3d 1429 (9th Cir. 1995) ....................................................................................65

*United States v. Brunson*,
54 F.3d 673 (10th Cir. 1995) ....................................................................................44

*United States v. Chube II*,
538 F.3d 693 (7th Cir. 2008) ...........................................................................18, 23, 36

*United States v. Consuegra-Rojas*,
No. 21-2606, 2022 WL 356375 (7th Cir. Feb. 7, 2022) ........................................................34

*United States v. Coscia*,
866 F.3d 782 (7th Cir. 2017) ...............................................................................27, 32

*United States v. Davison*,
761 F.3d 683 (7th Cir. 2014) ...............................................................................24, 25

*United States v. DISH Network L.L.C.*,
954 F.3d 970 (7th Cir. 2020) ....................................................................................31

*United States v. Ebbers*,
458 F.3d 110 (2d Cir. 2006)......................................................................................31

*United States v. Evans*,
970 F.2d 663 (10th Cir. 1992) ...................................................................................41

*United States v. Finnerty*,
533 F.3d 143 (2d Cir. 2008)......................................................................................49

*United States v. Fones*,
51 F.3d 663 (7th Cir. 1995) ......................................................................................39

*United States v. Gaind*,
829 F. Supp. 669 (S.D.N.Y. 1993) ............................................................................59

*United States v. Ghaddar*,
678 F.3d 600 (7th Cir. 2012) ....................................................................................41

*United States v. Gordon*,
495 F.3d 427 (7th Cir. 2007) ....................................................................................32

*United States v. Harris*,
791 F.3d 772 (7th Cir. 2015) ...............................................................................40, 41

*United States v. Havis*,
927 F.3d 382 (6th Cir. 2019) ....................................................................................33

*United States v. Hawkins*,
76 F.3d 545 (4th Cir. 1996) ......................................................................................45

*United States v. Laws*,
819 F.3d 388 (8th Cir. 2016) ....................................................................................40

*United States v. Lovies*,
16 F.4th 493 (7th Cir. 2021) .....................................................................................40

*United States v. Mehta*,
307 F.Supp.2d 270 (D. Mass 2004) ..........................................................................56

*United States v. Moskovits*,
86 F.3d 1303 (3d Cir. 1996).......................................................................................64

*United States v. Nacchio*,
573 F.3d 1062 (10th Cir. 2009) ................................................................................31

*United States v. Nelson*,
774 F.3d 1104 (7th Cir. 2014) ..................................................................................46

*United States v. Olis*,
429 F.3d 540 (5th Cir. 2005) ....................................................................................31

*United States v. Osmani*,
20 F.3d 266 (7th Cir. 1994) ......................................................................................68

*United States v. Redemann*,
295 F. Supp. 2d 887 (E.D. Wis. 2003).......................................................................59

*United States v. Riccardi*,
989 F.3d 476 (6th Cir. 2021) ....................................................................................33

*United States v. Rosenberg*,
585 F.3d 355 (7th Cir. 2009) ....................................................................................18

*United States v. Roth*,
No. 05 CR 792-5, 2008 WL 686783 (N.D. Ill. Mar. 11, 2008) ..........................................60, 61

*United States v. Rutkoske*,
506 F.3d 170 (2d Cir. 2007).......................................................................................31

*United States v. Salahmand*,
651 F.3d 21 (D.C. Cir. 2011).......................................................................................42

*United States v. Salem*,
597 F.3d 877 (7th Cir. 2010) ....................25

*United States v. Schroeder*,
536 F.3d 746 (7th Cir. 2008) ....................28

*United States v. Serafini*,
233 F.3d 758 (3d. Cir. 2000)....................56

*United States v. Skys*,
637 F.3d 146 (2d Cir. 2011)....................43

*United States v. Soto-Piedra*,
525 F.3d 527 (7th Cir. 2008) ....................24, 26

*United States v. Winstead*,
890 F.3d 1082 (D.C. Cir. 2018) ....................33

**Statutes**

7 U.S.C. § 6c(a)(5)(C)....................12, 14, 51

18 U.S.C. § 3553....................55

18 U.S.C. § 3553(a) ....................15, 16, 46, 47, 59

18 U.S.C. § 3553(a)(1)....................16

18 U.S.C. § 3553(a)(2)....................16

18 U.S.C. § 3553(a)(4)....................16

18 U.S.C. § 3553(a)(6)....................16, 61

**Other Authorities**

5 Wigmore, *Evidence* § 1367 (3d ed. 1940) ....................37

75 Fed. Reg. 67,301 (Nov. 2, 2010)....................50

78 Fed. Reg. 31,890 (May 28, 2013) ....................12, 21, 51

Stewart Bishop, *Ex-BofA Trader Avoids Prison for Spoofing Treasury Notes* (July
28, 2022), https://tinyurl.com/4m8b7pb6 ....................62

CME Rule 432 ....................11, 12, 48, 49, 50, 60

CME Rule 575 ....................12, 53

Complaint, *U.S. Commodity Futures Trading Comm'n v. Wilson*, No. 13 CIV 7884 (S.D.N.Y. Nov. 6, 2013) ....................................................................51, 52

Peter J. Henning, *The Fine Line Between Smart and Illegal*, N.Y. Times, Apr. 27, 2015..................................................................................................................10

Julia Kagan, *Garden Leave: What it is, Pros and Cons for Employers, Employees*, Investopedia (Aug. 16, 2022), https://tinyurl.com/yz9bejts ..................................9

Michael Lewis, *Flash Boys*: *A Wall Street Revolt* (2014) ..............................................10

Opposition to Motion to Dismiss, *U.S. Commodity Futures Trading Comm'n v. Wilson*, No. 13 CIV 7884 (S.D.N.Y. Jan. 31, 2014)................................................52

Steven Perlberg, *Everyone's Talking About The High-Frequency Trading Firm That Just Had 1 Day of Trading Losses In 1,238 Days*, Business Insider, Mar. 11, 2014, https://tinyurl.com/4bkuaf52.........................................................................10

*Reforming U.S. Financial Market Regulation*: Hearing before the S. Comm. on Agriculture, Nutrition, and Forestry, 111th Cong. 79-151 (2009)...........................................50

Reuters Staff, *BofA Commods Revenue Gets Big Boost from Merrill*, Reuters (Apr. 20, 2009), https://tinyurl.com/5ybvx5jz ........................................................55

Gary Shorter & Rena S. Miller, Cong. Rsch. Serv., R43608, *High-Frequency Trading: Background, Concerns, and Regulatory Developments* (2014), https://tinyurl.com/2p8hsjk6 .......................................................................................10

Trial Transcript, *United States v. Pinto-Thomaz*, No. 18-cr-579 (S.D.N.Y. Apr. 16, 2019), ECF No. 127.............................................................................................60

*United States v. Chanu*, No. 18-cr-35 (N.D. Ill. Aug. 26, 2021)...................................................................................62

*United States v. Coscia*, No. 14-cr-551 (N.D. Ill. July 14, 2016) .................................................................................62

*United States v. Forbes*, No. 22-cr-97 (E.D.N.Y. Aug. 2, 2022) ...................................................................................62

*United States v. Gandhi*, No. 18-cr-609 (S.D. Tex. July 20, 2021) ..............................................................................62

*United States v. Liew*, No. 17-cr-1 (N.D. Ill. Nov. 17, 2021).....................................................................................62

*United States v. Milrud*, No. 15-cr-455 (D.N.J. Apr. 24, 2022)....................................................................................62

*United States v. Mohan*,
No. 18-cr-610 (S.D. Tex. July 19, 2021) ....................62

*United States v. Sarao*,
No. 15-cr-75 (N.D. Ill. Jan. 29, 2020)....................62

*United States v. Vorley*,
No. 18-cr-35 (N.D. Ill. June 30, 2021)....................62

*United States v. Wang*,
No. 22-cr-10123 (D. Mass. Nov. 30, 2022) ....................62, 63, 64

*United States v. Zhao*,
No. 18-cr-24 (N.D. Ill. Feb. 4, 2020) ....................62

U.S. Dep't of Justice, Press Release (Oct. 2, 2014), https://tinyurl.com/3bz7wt9t ....................12

U.S. SEC, *Market Activity Report Methodology* (updated Mar. 25, 2021),
https://tinyurl.com/3x75xj83....................35

U.S.S.G. § 1B1.3(a) ....................18, 42

U.S.S.G. § 2B1.1.................... *passim*

U.S.S.G.  § 3A1.1(b)(1) ....................42

U.S.S.G. § 3B1.1....................38, 39, 40

U.S.S.G. § 3B1.1(c) ....................15, 39

U.S.S.G. § 3E1.1 ....................14, 64

U.S.S.G. § 4A1.1(a) ....................46

Liam Vaughan, *Flash Crash: A Trading Savant, a Global Manhunt, and the Most Mysterious Market Crash in History* (2020)....................10

## PRELIMINARY STATEMENT

On the surface, there is nothing remarkable about John Pacilio. There is nothing extraordinary about a man cherishing family and friends; nothing uncommon about a man being quick to help a colleague or neighbor in need; nothing especially rare about a man serving his community or exhibiting generosity to the people and causes that matter to him. Many people share the traits of humility, empathy, and dependability. And there is nothing particularly unique about being a gifted listener or showing respect and concern for the people that you encounter. But what is rare, what is uncommon, what is *remarkable* about John Pacilio is the sheer constancy with which he demonstrated these admirable characteristics throughout every stage of his life.

The Court need only look to the letters of support offered by dozens of people from different chapters of John's life as proof of his fundamental decency and the positive impact that he has made on the people that have had the good fortune to know him. While John's supporters hail from different generations and cut across virtually every area of his life, a common theme emerges from their letters: In a world increasingly focused on self-promotion and instant gratification, John has led a life of substance—one filled with quiet resolve and focused on lifting up people around him. Candidly, if undersigned counsel did not have a different role to play in this proceeding, the Court would have yet another long letter of support to add to the collection. Indeed, outside the boundaries of this case, there is no indication anywhere in the record of John having anything but an overwhelmingly positive influence on the people and places around him. Consistent with the Supreme Court's admonition that district courts impose sentences that "'fit the offender and not merely the crime,'" *Pepper v. United States*, 562 U.S. 476, 488 (2011), we respectfully request that the Court impose a non-custodial sentence here.

Separate and apart from John's exemplary character and history of positive contributions to the world, a host of other mitigating factors militate strongly against a sentence of incarceration.

For starters, the collateral consequences imposed by this case have far exceeded those that typically arise from prosecution, prior spoofing prosecutions in particular. Five years of public prosecution and persistent media coverage on global, national, and local levels have taken a terrible toll on John and his family and forever altered the trajectory of their lives. Beyond suffering a fundamental loss of privacy and public humiliation owing to the high-profile nature of the case, John's family has endured episodes of harassment by unscrupulous reporters and deranged individuals targeting the Pacilio children. Worse yet, the global pandemic extended and exacerbated the stress of criminal prosecution, as did the extraordinary allegations of prosecutorial misconduct leveled by the former lead prosecutor (which became national news). In short, the personal loss to John and his family arising from his criminal prosecution has been devastating.

Adding to the toll, John's prosecution brought a previously unblemished career spanning four decades to an immediate—and ignominious—end. John not only lost a rewarding career, millions of dollars of deferred compensation, and access to future earnings, but he lost the ability to communicate with a significant number of long-time colleagues and friends, suddenly off limits on account of the pending charges against him.

But none of these personal and professional hardships altered John's good character. Instead, in the crucible of his own personal struggles, John responded exactly how the people that know him best would expect: by making constructive use of his time, by searching for ways to ease his family's burden, and by trying to do the right thing. Confronted with the criminal prosecution and the loss of his career, John stayed true to form. He sought to fill his schedule with a range of productive pursuits: volunteering at a local foodbank, making home improvements, working on his case, and supporting his wife and children in every conceivable way. That John pursued these vocations while maintaining an unblemished record of compliance with pre- and

post-trial supervision for the entire five-year duration of this case only underscores why imposing a custodial sentence would go beyond what is necessary to serve the ends of justice here.

Such an outcome would also comport with the growing body of cases in which courts have declined to impose sentences of incarceration for convicted spoofers. Perhaps in recognition that most traders accused of spoofing never confront criminal charges *at all*—more often paying fines to exchanges or civil regulators and enduring modest suspensions to resolve spoofing charges—the last four courts to sentence convicted spoofers declined to impose incarceration, including in cases where the government had alleged *millions* of dollars of losses, far in excess of the losses alleged here. The need to avoid disparate sentences among similarly situated defendants, along with the availability of alternative remedies to incarceration, including supervised release, a criminal fine, or home confinement, both weigh strongly against a sentence of incarceration.

The rationales to forego a sentence of incarceration only grow stronger when the offense conduct at issue is placed in the appropriate context. While we respect that this Court has sustained the government's novel fraud theory, when evaluating the nature and seriousness of the offense conduct and John's relative culpability, we respectfully submit that the Court should consider how the offense conduct occurred in the midst of a radical shift in the futures markets—the rising dominance of automated trading programs that utilized order types and speeds that literally rendered their orders invisible to human traders. The overwhelming majority of conduct at issue transpired before Congress defined and specifically proscribed spoofing, in the context of sophisticated professional markets that permit order types that share some of the characteristics of spoof orders and impact the market in analogous ways. And all the conduct at issue occurred during an era without precedent for the characterization of spoof orders as fraudulent and while the dominant regulators for futures trading, the CME and the CFTC, consistently drew distinctions

between spoofing and fraud in public statements. Against this backdrop, we respectfully submit that, on the scale of culpability applicable to fraud offenses, the conduct at issue here falls on the lower end of the spectrum.

While the U.S. Probation Office ultimately recommended a sentence of incarceration of 12 months and one day, it is critical to note that recommendation rested on the erroneous adoption of the government's proposed set of relevant conduct, loss calculations, and a victim enhancement. As the Court may recall, at trial the government made the strategic decision to forego offering any expert testimony to support an inference of intent arising from the four-step trading sequence that it consistently framed as the distinguishing characteristic of the fraudulent scheme. It also represented to the Court that the four steps were only "loose parameters" and assured the Court that it would "not argu[e] that those parameters are the same thing as spoofing." Dkt. 237, at 19. But it now argues *exactly* that and seeks to treat every single trading sequence where these four steps converge over the entire six-year period in question as fraudulent. Even worse, after insisting to the Court and the jury that any trading episodes that did not include the four steps were "irrelevant" and "not criminal conduct," Tr. 2064, the government now portrays as fraudulent a large number of sequences that do *not* include each of the four steps.

Put another way, the government wants this Court to conclude that the mere act of identifying 1,012 trading sequences, many of which fall *outside* its own "loose parameters" for spoofing, constitutes a preponderance of evidence that John spoofed in every one of those sequences. That is not just absurd, it is dangerous. Such a ruling would radically alter the complexion of futures trading, as it would signal that the CFTC need only offer raw trading data from a collection of trading sequences that *sometimes* meet a set of criteria that *might* be consistent with spoofing to satisfy the intent element for spoofing and fraud, without any need to offer

corroborating evidence. In that scenario, the question of what constitutes spoofing would rest solely in the eyes of the government beholder. But that is not the law today. As it stands, under controlling Seventh Circuit authority, the government's failure of proof as to the non-trial episodes is glaring. And if any doubts should remain, the Court now has testimony from three different respected experts in the field (one from trial and two at sentencing) explaining the many reasons why a collection of trading sequences based on "loose" and inconsistently applied criteria fails to establish any reliable evidence of intent, much less a preponderance of evidence.

This obvious failure of proof as to the relevant conduct episodes is just one of many fatal flaws underlying the government's proposed loss calculations. As detailed in the expert declarations submitted by Dr. Emre Carr, *see* Ex. C, and Dr. Jeremy Cusimano, the government's loss calculations suffer from a laundry list of factual errors, methodological flaws, unsupported inferences, and misapplied economic theory. Thus, even if the Court declined to hold the government to its burden of proof for each of the 1,012 separate episodes of relevant conduct applicable to John, the fundamental flaws endemic to Dr. Venkatarman's analysis render the government's loss calculations unreliable and incapable of adoption, particularly in the absence of an evidentiary hearing to weigh expert credibility and resolve underlying fact disputes. And as the Third Circuit recently held, the government cannot circumvent these problems with its actual loss calculation by invoking intended loss, which has no basis in relevant Guidelines text and which the government has not invoked in any case. *See generally* U.S. VOF.

Finally, while the U.S. Probation Office appropriately declined to adopt the government's proposed sentencing enhancements for leadership, sophisticated means, and substantial overseas conduct, its acceptance of the government's proposed enhancement for 10 or more victims improperly rests on the say-so of a prosecutor. Indeed, apart from attorney statements (relayed as

hearsay), the PSR offers no evidence that would permit John (or the Court) to validate its identification of 10 or more alleged victims. Because the government has chosen to rest on mere *ipse dixit* to support the application of this enhancement, the Court should decline to adopt it.

## RELEVANT BACKGROUND

Over the course of the nine-day trial in this case, the government reduced John's life to a series of snapshots measured in milliseconds. The focus was a small number of trades from the hundreds of thousands that John made over the course of his 32-year career in finance, as well as a handful of chats. Each of those trades unfolded in a matter of seconds or, in some cases, fractions of seconds. Collectively, the trading on the visible orders from the 27 trial episodes lasted less than a minute (by our count, 57.455 seconds). The complete trial episodes, from start to finish, span less than an hour of John's life spread out across six years.[1] Until the sentencing phase of this case, every other minute and hour of his 58 years of life, and everything that defines John as a human being, has escaped attention. This submission aims to pull back the lens, introduce necessary context, and allow the Court to take full measure of John Pacilio as a person.

### I. John Pacilio

In fashioning an appropriate sentence here, the Court must look beyond the narrow confines of this case and consider the totality of John's history and his many contributions in life. That is no easy task. The sum-total of John's contributions to the world cannot be characterized by a few grand gestures, high-profile awards, or public accolades. Instead, the story of his life—and the essence of who he is—arises from thousands of subtle acts of kindness, decades of loyal support to family, friends, and colleagues, and a lifetime of putting the needs of others above his

[1] This calculation excludes one anomalous episode, episode #54a in the government's Exhibit 21, that somehow consists of 37 minutes on its own, where John's orders are separated by around 30 minutes.

own. While it would be impossible to catalog all the many ways in which society has benefited from John's active participation in it, the letters before the Court provide critical windows into John's true nature and what would be lost by his incarceration.

John's family was deeply affected by the mischaracterization of his character both in court and in the press. They and others who know John have endeavored to correct the record with their letters of support. And those letters bear powerful witness to John's character. We will not spend this sentencing memorandum repeating those letters, Ex. B, or attempting to describe the video submission prepared by John and his family, Ex. A, all of which we commend to the Court. There is simply too much material to convey here, much of it intensely private. But we would like to highlight the most fundamental parts of his character.

Collectively, the letters shed light on the many ways in which John used nearly six decades of life to take a sincere interest in the lives and welfare of others, to forge and maintain lasting connections with those around him, and to shoulder responsibility for others in challenging times. He learned from his own parents the importance of a family, faith, and a strong work ethic. Under their care, he developed a set of lifetime values that echo throughout the letters before the Court: kindness, humility, empathy, and resilience among them. Throughout his life, John endeavored to follow the example set by his parents, and when he met his wife in college, he found a life partner that shared his core values and a vision of a life built around family, friends, and faith.

While John's work provided a productive outlet for his natural curiosity and a comfortable life for his family, he made sure to maintain perspective. He wanted to be there to drive his children to dance class and music lessons, to coach practice, to help with homework, and share meals with his family. As his family grew and new challenges arose at home, rather than seek distraction in work, John took the opposite approach: downshifting his career at its peak, quitting an intense

role running a commodities business for a global investment bank, and recalibrating his work/life balance to focus on being present with his family during formative years for his children. There is nothing more important to John than the welfare of his family.

As the letters well attest, John is also the type of person who looks for ways to lend a helping hand, to be present, and to carry the mental load during challenging times. For so many different people, he is that one person you know you can count on to show up during the hardest moments of life, no matter what. The letters are full of examples of John doing exactly that time and again, stepping up in ways big and small, to help those around him. He provided shelter, opening his home to family and friends in need. He offered his physical labor—everything from painting houses, to landscaping, to using his handyman skills to fix things for anyone with a problem they could not solve alone. He quietly provided financial assistance with mortgages, funeral expenses, family reunions, tuition, and more. He provided support to everyone from junior colleagues struggling to find their way at work to close family members and friends going through the darkest periods of their lives. It is not just that John absorbs the most difficult roles in these moments—the eulogies, the graveyard shifts, the end-of-life caretaking. He frequently tackles the more mundane burdens as well: the planning, the preparation, the unsung everyday work of figuring out what needs to be done and then doing it. The letters highlight John's thoughtfulness, his empathy, and his intuitive sense of how to help someone in virtually any situation.

Finally, an observer of the trial would never know it, but the truth is that John Pacilio is very much a man of his word. Letters from not just friends and family, but his former colleagues and clients attest to his honesty, his moral compass, and his dedication to doing the right thing. They describe his stellar reputation in the industry as an honorable and trustworthy person. Prior to the onset of this case, John's integrity has never before been so much as questioned, and the

letters before the Court speak to how, throughout every stage of his life, John served as a model of integrity for others. If John's actions in a patchwork of episodes measured in milliseconds over a period of six years really do amount to fraudulent conduct, the letters make abundantly clear that conduct was aberrational. To those who know him best, John Pacilio is a man of integrity.

## II. John's Role in a Transforming Marketplace

During the period at issue, John traded derivative instruments at BAML from October 2007 until April 2011, and at Morgan Stanley from June 2011 until January 2018.[2] He was primarily an options trader that relied on the futures market to manage the risk associated with his options positions. *See*, *e.g.*, Tr. 134, 1007. As John's career progressed, the marketplace transformed from one characterized by human beings transacting face-to-face on trading floors to one defined by anonymized algorithmic trading conducted through machines with varying levels of speed and sophistication. Whereas pit trading placed a premium on transparency and personal accountability, electronic trading platforms heralded a new era of trading favoring super high speeds, volume, and anonymity. Anonymized trading algorithms ("algos") now had the capacity to process and act on new information in microseconds, moving in and out of the market with orders at speeds that literally rendered them invisible to manual traders, earning the apt moniker of "black-box" traders for their opaqueness along the way. Tr. 122, 173-74, 264, 493-96. 1447; *see also* Dkt. No. 500-

[2] John provided notice of his resignation from BAML on April 11, 2011. *See* Ex. D. Pursuant to BAML's "garden leave" policy, he was not allowed to begin his new employment at Morgan Stanley for 60 days, *i.e.*, until June 11, 2011—but during that 60-day period he was also not allowed to continue his work for BAML. *See id.*; Julia Kagan, *Garden Leave: What it is, Pros and Cons for Employers, Employees*, Investopedia (Aug. 16, 2022), https://tinyurl.com/yz9bejts (the term "garden leave" derives from the fact that the employee cannot work, and is thus "likely to spend their time pursuing hobbies"); Tr. 1382 (Bank of America witness explaining garden leave). Indeed, as of April 12, 2011, John was required to "*immediately* return all … confidential" and "proprietary … information" in his possession to BAML. Ex. D at 1 (emphasis added). During this 60-day period, John was *prohibited* from, and did not, engage in any trading activity, although he still received a paycheck from BAML. Tr. 1382.

1.[3] Using these strategies, algorithmic trading achieved profitability at a level of consistency unparalleled in the annals of trading history; as just one example, in 2014 the high-frequency trading firm Virtu disclosed that it had only one losing day of trading in *almost five years*. Steven Perlberg, *Everyone's Talking About The High-Frequency Trading Firm That Just Had 1 Day of Trading Losses In 1,238 Days*, Business Insider, Mar. 11, 2014, https://tinyurl.com/4bkuaf52.

Often using these black-box algorithms, professional traders from some of the most sophisticated trading firms in the world, like Citadel, deployed multiple different teams to trade futures and options on the Chicago Mercantile Exchange ("CME"). Tr. 123, 493-96, 1480-81. Most CME orders were placed by algorithmic traders, Tr. 122-23, and most orders placed on the exchange were cancelled before execution. Tr. 136, 1465; *see also* Peter J. Henning, *The Fine Line Between Smart and Illegal*, N.Y. Times, Apr. 27, 2015, https://tinyurl.com/mv9wbuz6 ("[M]ore than 90 percent [of high-frequent orders] are estimated to be canceled."). The CME did not require any minimum time for orders to remain open, and traders were permitted to cancel orders for any reason or no reason at all. Tr. 854-55. It was also common for traders to place orders to buy and sell the same product at the same time. Tr. 133, 139. Underscoring the point, the trading data shows that the Citadel algorithm discussed at trial [redacted] Exs. E, F, and [redacted] Ex. G.

---

[3] Many have criticized the practice of high-frequency trading. See, e.g., Gary Shorter & Rena S. Miller, Cong. Rsch. Serv., R43608, *High-Frequency Trading: Background, Concerns, and Regulatory Developments* 5, 10 (2014), https://tinyurl.com/2p8hsjk6; Michael Lewis, *Flash Boys*: *A Wall Street Revolt* (2014); Liam Vaughan, *Flash Crash: A Trading Savant, a Global Manhunt, and the Most Mysterious Market Crash in History* (2020). But despite the many problems high-frequency trading has introduced into the market, there is no question that the practice is legal.

With algorithmic trading occurring hundreds of times faster than the blink of an eye, algo trading made markets volatile and opaque. *See, e.g.,* Tr. 878 (government cooperating witness explaining how algos made it hard for manual traders "to get trades filled"); Tr. 874-75 (noting how black-box traders would often "jump in front" of manual traders). Exchanges like the CME offered a dizzying array of order types and permitted techniques that allowed traders to disguise their true intentions (e.g., "One-Cancels-the-Other" and "Minimum Quantity" orders, Tr. 162-63), hide supply and demand in the market (e.g., "Stop" orders and "Hidden Quantity Orders," Tr. 158-59, 314), probe market depth ("Ping" orders"), and hunt for desired prices with invisible order types (e.g., "Fill-or-Kill" and "Fill-and-Kill" orders, Tr. 160-62); *see infra* at 52-53.

Because so much of the market was hidden by pervasive use of these order types, traders like John would engage in "price discovery," that is, place orders in the market to get a true sense of supply and demand and "ascertain what liquidity may or may not be in the market," Tr. 154-55; 1959. Even CME witnesses acknowledged at trial that "price discovery is something that CME very much supports." Tr. 154. Traders like John were also constantly multitasking and running multiple strategies at once, often placing orders "for entirely different strategies for entirely different reasons." Tr.133, 1063-64, 2212-13 (discussing DX 161-A).

## III. Guidance Available to John During the Relevant Period

As is discussed in more detail below, the contemporaneous guidance available to John during the relevant period bears on his relative culpability. Even if courts—including this Court—have recently held that conduct like that at issue here falls within the scope of the fraud statutes, the status of such conduct was at least ambiguous at the relevant time—as this Court itself held.

At trial, much of the focus was on CME Rule 432. That rule's broad and generic language prohibited, among other things, acting in "bad faith" and conduct "inconsistent with just and equitable principles of trade." Tr. 233, 235-36. The Court held as a matter of law before trial that

CME 432 was ambiguous on the key threshold question of whether it prohibited spoofing. Dkt. No. 596 at 73. In other words, a reasonable person could have concluded that the Rule did *not* prohibit spoofing. Only in September 2014 did the CME enact Rule 575, which expressly prohibits spoofing. Tr. 242-46.

CME Rule 575 was enacted to implement an informal "Interpretative Guidance and Policy Statement" from the CFTC that in turn interpreted the Dodd–Frank Wall Street Reform and Consumer Protection Act of 2010. Responding to a request from the CFTC and SEC, *see infra* at 50, Congress in the Dodd-Frank Act prohibited "'spoofing' (bidding or offering with the intent to cancel the bid or offer before execution)." 7 U.S.C. § 6c(a)(5)(C). That provision went into effect on July 16, 2011. In the wake of Dodd-Frank, the CFTC engaged in notice-and-comment rulemaking to define spoofing. Numerous industry participants urged the CFTC that placing at-risk orders—that is, orders (like those at issue in this case) that could be "hit" by another trader and are thus at risk of execution—was legitimate trading, not spoofing. 78 Fed. Reg. 31,890, 31,896 (May 28, 2013) (BGA comment); *see also infra* at 51. The CFTC ultimately abandoned its rulemaking in favor of non-binding guidance stating that it would distinguish spoofing from legitimate trading "by evaluating all of the facts and circumstances of each particular case." 78 Fed. Reg. 31,896.

It was not until the indictment against Michael Coscia was unsealed in October 2014 that the public received specific warning that the government could regard spoofing as capable of grounding fraud charges, albeit with a different theory of fraud than here, predicated on the use of a trading algorithm that had been pre-programmed to cancel orders before execution. *See* U.S. Dep't of Justice, Press Release (Oct. 2, 2014), https://tinyurl.com/3bz7wt9t (announcing the *Coscia* indictment as "the first federal prosecution of its kind").

## IV. The Offense Conduct

As detailed above, Dodd-Frank's prohibition on spoofing went into effect in July 2011. But in this case, the government argued that "bidding or offering with the intent to cancel the bid or offer before execution" had been fraudulent long before Dodd-Frank. It thus charged John with spoofing, conspiracy, wire fraud, and commodities fraud for conduct dating back as far as 2009. Its theory with respect to the fraud counts was that certain of John's futures orders contained implicit misrepresentations in the form of half-truths: By placing an order, according to the government, John was representing that he subjectively wanted to trade when he in fact planned to cancel the order. *See*, *e.g.*, Tr. 267. This allegedly created a false impression of supply and demand in the market, Tr. 187-88, even though the government and its witnesses conceded that the alleged spoof orders were live and at risk of execution, *e.g.*, Tr. 109-110, 859, GX68.

The government consistently described the charged fraudulent scheme as requiring "four simple steps." Tr. 6. First, John would place an iceberg order on one side of the market. This was the order that, according to the government, John actually wanted to trade. Second, he would place a large order on the other side of the market—the so-called "spoof" order. This order, according to the government, John intended to cancel and did not really want to trade. Thus, the third step of the charged scheme required another trader to react to the spoof (and the supposed false supply or demand that it represented) by executing the iceberg order on the other side of the bid-offer spread. Fourth, once the "false" supply or demand from the spoof order caused another trader to execute the "genuine" iceberg order, John would cancel the spoof order.

## V. The Trial

Although the government repeatedly told both the jury and the Court that one could infer criminal intent, and thus a fraudulent spoof, from the fact that a trade followed its claimed four-step sequence, Tr. 11, 1532-33, 1540, 2023, the government never purported to prove fraudulent

intent *solely* on the trading data. Rather than offering statistical modeling or expert analysis that certain trading patterns are definitive proof of a fraudulent spoof, the government instead offered evidence in the form of cooperator testimony and chat communications to corroborate fraudulent intent. It bears emphasizing that out of all of the many chats entered into evidence, only four involve John. Tr. 2204. (Incidentally, John's supervisor was on all four of those chats, and never raised any concerns with their contents. *Id.*) And none of John's chats involved the kind of language the government highlighted in closing. Tr. 2222-28.

On August 5, 2021, a jury found John guilty of conspiracy, wire fraud, and commodities fraud.[4] The vast majority of the trading activity at issue took place before the Dodd-Frank spoofing provision went into effect. And the jury acquitted John on the sole spoofing charge he faced under § 6c(a)(5)(c) (Count 20, related to an April 17, 2014 trade) after he introduced records showing that his alleged spoof order and iceberg order in the charged episode were connected to two different strategies and, thus, entirely legitimate. Tr. 2212-13 (discussing DX 161-A); Tr. 2268.[5]

## VI. Probation's Presentence Report

Probation disclosed its Presentence Report ("PSR") on November 29, 2022. The PSR calculates a total offense level of 21 and criminal history category of I, resulting in a Guidelines range of 37 months to 46 months. To arrive at this result, Probation first declined to recommend a two-point adjustment for acceptance of responsibility under § 3E1.1 because John put the government to its burden at trial. PSR ¶¶ 29, 48. Probation next concluded that the base offense level of 7 should be increased by 12 levels under § 2B1.1(b)(1), because it concluded that the loss amount was greater than $250,000 but less than $550,000. PSR ¶ 33. Probation further concluded

---

[4] John plans to challenge on appeal the legal conclusion that the conduct charged in this case constitutes fraud within the meaning of those statutes.

[5] Because the April 2014 trade was fairly recent (more so than trading from 2009), more internal bank records were available to provide context for John's recent trading than for older trades.

that the base offense level should be further increased by two levels under § 2B1.1(b)(2)(A) because the offense involved 10 or more victims. PSR ¶ 37. Probation then found that enhancements under § 2B1.1(b)(10)(C) (for sophisticated means) and § 3B1.1(c) (for an "organizer, leader, manager, or supervisor" in the offense) were *not* warranted. PSR ¶¶ 40, 42-44. Probation ultimately recommended a sentence of 12 months and one day.

The defense objects to Probation applying the loss enhancement and the enhancement for an offense involving 10 or more victims. *See infra* at 16-38, 42-46. As is discussed further below, the loss enhancement is unwarranted for a host of independent reasons. And Probation's inclusion of the 10 or more victim enhancement is based on an Assistant U.S. Attorney's unsworn statement to Probation, which is not competent evidence. *See infra* at 45.

The PSR also contains several material errors and omissions. The PSR states that the government's expert identified 1,490 sequences in which John was involved, but that is the number of sequences attributable to *Mr. Bases*; far fewer—1,012—are attributed John. Carr Decl. (Ex. C) at 6 n.3. Further, the PSR does not address or explain the basis on which Probation concluded that the government had proven that John committed fraud in each of the 1,012 independent sequences at issue. Finally, while the PSR attaches the declaration provided by the government's expert, it omits the declaration provided by the defense expert on the same subject and declined to engage with any of the contentions advanced therein or otherwise explain why it apparently credited the government's expert. Given the importance of these errors and omissions, the Court should not defer to the PSR's Guidelines calculation.

**SENTENCING ANALYSIS**

18 U.S.C. § 3553(a) directs that a court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, including "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," "to

afford adequate deterrence to criminal conduct," and "to protect the public from further crimes of the defendant." § 3553(a)(2). In imposing sentence, the court "shall consider" factors including "the nature and circumstances of the offense and the history and characteristics of the defendant," § 3553(a)(1), "the sentencing range established" under the applicable Sentencing Guidelines, § 3553(a)(4), and "the need to avoid unwarranted sentenc[ing] disparities among defendants with similar records who have been found guilty of similar conduct," § 3553(a)(6).

The § 3553(a) factors are of paramount importance because they guide the Court in "consider[ing] every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). "Underlying this tradition is the principle that 'the punishment should fit the offender and not merely the crime.'" *Pepper v. United States*, 562 U.S. 476, 487–88 (2011). After thorough consideration of all relevant factors, we respectfully submit that a term of incarceration would exceed what is necessary to satisfy the purposes of criminal punishment here. As is set forth below, the alternatives of probation or home confinement align better with the most recent sentences imposed on similarly situated defendants, take account of the other circumstances of this case discussed herein, and are "sufficient, but not greater than necessary" to achieve the goals of criminal punishment under 18 U.S.C. § 3553(a).

## I. The Correct Guidelines Range Is Zero-To-Six Months

The Guidelines calculations offered by government and Probation are seriously flawed. First, they erroneously include as relevant conduct (i) hundreds of trading sequences for which there is no evidence of intent beyond raw trading data showing order activity that does not correspond with any uniform pattern, *see infra* § I.A.1, and (ii) a long list of trading sequences that must be excluded as relevant conduct for a variety of independent reasons, *see infra* § I.A.2.

Second, regardless of the universe of relevant conduct, the government expert's methodology for calculating losses is fatally flawed. *See infra* § I.B. For starters, the expert ignores binding Supreme Court precent on loss causation in financial markets and uses an unreliable "but-for" price for quantifying losses. He also depends upon a host of unfounded assumptions, and often does not provide sufficient data to confirm—or disprove—his theories. If the Court does not reject the expert's analysis outright, it should at minimum hold an evidentiary hearing to resolve the material factual disputes between the parties.

Finally, the government wrongly incorporates multiple sentencing enhancements in the Guidelines calculation it provided to Probation. It includes an enhancement based on the number of victims here, despite its failure to produce records tying new alleged victims to episodes of relevant conduct. § I.C.3. And it seeks enhancements for sophisticated means and leadership that Probation appropriately found to be unsupported by the record. § I.C.1, 2.

### A. The "Relevant Conduct" For Sentencing Consists Only Of The Trial Episodes

The government seeks to expand the pool of relevant conduct beyond the 72 trial episodes (of which only 27 involved John) to capture 1,012 trading sequences. But the government has not provided sufficient or reliable evidence to prove the newly-disclosed episodes involved unlawful conduct—no chats, no charts, no cooperator testimony—nothing. It did not even disclose which orders in the alleged trading sequences it alleged to be spoofs.[6] As it stands, the government rests its universe of relevant conduct allegations entirely on the four-step "pattern" that it cited repeatedly at trial. But that purported pattern does not suffice to prove intent; otherwise, the

[6] At the September 27, 2022 status conference where the issue was raised, the government objected to a defense request that the government produce this information on the ground that it would be burdensome to do so. As the trial evidence showed, *not* every visible order in every disclosed sequence is a spoof; otherwise, the government would have responded to the defense request by simply stating that every visible order is a spoof.

government could prevail in civil enforcement actions by creating a pattern from cherry-picked trading data alone.

To be sure, there is no "pattern" here, much less one backstopped by reliable expert statistical analysis that might permit an inference of intent. Indeed, the government flagrantly deviates from its own definition of the so-called "pattern" in more than *half* of the relevant conduct episodes, including in ways that it deemed impermissible at trial. By including episodes that materially deviate from its four-step pattern in its proposed relevant conduct, the government merely succeeds in proving once and for all that there is no uniform "pattern" in John's trading, let alone one that qualifies as a statistically significant and reliable basis for inferring intent.

### 1. The Government Has Not Proven Fraudulent Intent For The Non-Trial Episodes

At sentencing, "relevant conduct must be unlawful," and the government "bears the burden" to show unlawfulness as to "each" instance of asserted conduct. *United States v. Chube II*, 538 F.3d 693, 702, 705-06 (7th Cir. 2008). The government and the Court cannot merely "discuss some" allegedly relevant conduct "and extrapolate that, because some of" those instances were unlawful, all the others were, too. *United States v. Rosenberg*, 585 F.3d 355, 357 (7th Cir. 2009). Nor can the Court "simply take the data in the government's spreadsheets and duplicate the figures as the findings" of the Court. *Chube II*, 538 F.3d at 703.

Probation, in its PSR, bypasses this issue entirely, citing Application Note 3(C) for the proposition that "[t]he court need only make a reasonable estimate of loss." But defining the universe of relevant conduct is a necessary threshold step before losses can be reasonably quantified. *See* United States Sentencing Commission, *Guideline Manual*, § 1B1.3(a) (Nov. 2018); § 2B1.1 (loss must stem from "relevant conduct" under § 1B1.3). Here, the government

has failed to carry its burden of proving that any episodes not asserted at trial were unlawful, and the Court should exclude those non-trial episodes from the loss analysis.

**a. The Government's Four Steps Cannot Reliably Identify Spoofing**

At trial, while the government hammered its claimed four-step scheme as indicative of fraudulent intent, it recognized that it could not rely *exclusively* on its purported four-step pattern to prove fraudulent intent at trial. Quite the contrary: it told the Court that the four steps consisted merely of a "kind of loose parameters" and represented it "was not arguing that those parameters are the same thing as spoofing." Dkt. 237, at 19. Rather than offer expert testimony and analysis of a random sampling of trading data to support an inference of intent, the government sought to prove intent via contemporaneous chats, emails, and cooperator testimony.

Now, however, the government urges that the mere presence of its four steps in a given episode is sufficient to find fraudulent intent. The jury, however, necessarily *rejected* the government's categorical argument that its claimed four-step "pattern" necessarily equals criminal intent by acquitting John on the spoofing count, *even though the trade charged in that count included the government's four steps*. In other words, John's acquittal is proof that not every trade that happens to include each of the four steps is a fraud. The reason the government's argument doesn't work is that each "step" in the government's supposed four-step pattern is a common, *legitimate* trading technique, *see, e.g.*, Tr. 133-40, 159-63, 315-16, 1028, 1959, and there are many reasons why those steps might coincide for non-fraudulent reasons or simply as a matter of chance, *see* Tr. 1948 (Prof. Fischel: "I'm saying this pattern of trading is completely routine. It happens all the time. It's in no way indicative of any wrongful conduct or spoofing scheme or anything else."). But the additional evidence (chat messages, etc.) that allowed the jury to find unlawful trading in the other counts is completely absent here as to the non-trial episodes that the government now wishes to use to exaggerate loss for sentencing purposes.

Defense expert Dr. Carr confirms that the so-called "pattern" offered by the government does not reliably identify instances of spoofing, just as the government previously told the Court. The government's four steps are not supported by any economic authorities, and the "pattern analysis generally does not suffice on its own to identify spoofing." Carr Decl. ¶ 30; *accord id.* ¶ 46. Dr. Carr explains how the universe of relevant conduct urged by the government does not arise from any discernable pattern in John's trading. In attempting to apply the government's four-step sequence, Dr. Venkataraman, the government's expert for sentencing, "makes arbitrary choices and never explains why [his definitions] are appropriate criteria to identify spoofing." Carr Decl. ¶ 32.

For example, Dr. Venkataraman provides no explanation at all for how much time could elapse between Steps 1 and 2—i.e., the amount of time between the placement of the iceberg and the supposed spoof order on the opposite side of the market. In roughly 10% of his asserted episodes, the Step 1 iceberg order was placed "more than five minutes before" Step 2. Carr Decl. ¶ 34. But in a market that moves in milliseconds, "if the [Step 1] iceberg order is placed minutes … before [Step 2], it casts serious doubts about any plausible connection between the executed and cancelled orders." *Id.* Even worse, in certain instances, Dr. Venkataraman applies the four steps in the wrong order, counting episodes where the "genuine" orders were executed (Step 3) *before* alleged spoofs were placed (Step 1) or *after* they were canceled (Step 4). *See id.* ¶ 35. Under the government's trial theory, such episodes are "inconsistent with an intent to spoof." *Id.* ¶ 36.

It is critical to point out that the consequences of the government's relevant conduct theory extend far beyond John's case. If the government can prove fraud by a preponderance of the evidence by relying on raw trading data alone, civil enforcement proceedings will be virtually

impossible to defend against and would effectively shift the burden of proof to defendants to disprove spoofing: The government would be able to satisfy its burden of proof any time it produces a chart showing an episode involving its four steps. That cannot be right. Indeed, the CFTC—charged with regulating the commodities markets—expressly disclaimed this sort of bright-line approach to spoofing in its "informal" guidance, instead adopting a standard that requires "evaluating all of the facts and circumstances of each particular case." 78 Fed. Reg. 31,896. The mere fact that a trading episode followed the government's four steps, without any other information, cannot be enough to conclude that it is *more likely than not* that the trade was unlawful, as it does not take account of any of the other relevant facts and circumstances of the particular case. The government has never produced any reliable statistical evidence or economic literature to support such a conclusion—because there is none. At most, the government has shown that it is *possible* for these four steps to occur in a fraudulent spoof, and it has relied on corroborating evidence to identify instances where these four steps occurred due to unlawful conduct rather than by chance. In the absence of such corroborating evidence, the government has not proven fraud for *any* of the non-trial episodes between 2009 and 2014 that happened to involve the government's four steps.

**b. Half Of The Asserted Episodes Do Not Fit The Four Steps**

Even if the government's four steps could suffice on their own to establish fraudulent intent, the government brazenly departs from its own purported pattern in approximately half of the asserted episodes. At trial, the government repeatedly emphasized the importance of *all* of the four steps in combination, even criticizing the defense trial expert Prof. Fischel on the ground that he had omitted one or more of them from his analysis. *See* Tr. 1541-42, 2063-64. The Court ultimately agreed that the jury was entitled to discount the defense's expert because he allegedly "ignored" certain of them. Dkt. 681, at 15. The government repeatedly emphasized that "the

*entire* four-step pattern … provides a basis from which to infer a fraudulent intent." Dkt. 662, at 24 (emphasis added); *accord* Tr. 2023, 2062, 2071-72 (repeatedly discussing "four steps" of pattern in closing). According to the government, trades that were missing any of the four steps were "irrelevant" and not "criminal conduct." Tr. 2064.

Now, the government abandons its own theory. Its expert Dr. Venkataraman concedes that he followed the government's four steps "*with the exception* that [he] also include[d] instances where the spoofing strategy does not result in any executions for the Defendants' iceberg order"—i.e., he includes episodes missing Step 3 (and the necessary predicate to Step 4 under the government theory). Venkataraman Decl. ¶ 14 (emphasis added). This is no minor exception: Of the 1,012 episodes asserted against John, 477 of them (i.e., 47%) are missing that step. Carr Decl. ¶ 39; *id.* Ex. 2, *l.* 9. Those episodes must be excluded because, as the government correctly conceded at trial, they are "irrelevant" and not "criminal conduct."

And that is only the beginning of Dr. Venkataraman's misapplication of the government's four steps. Among other mis-ordered permutations of the so-called "pattern," Dr. Carr observed episodes missing Step 1 or Step 4, episodes that do not satisfy the Step 1 parameters, and episodes that do not meet Dr. Venkataraman's stated five-second criterion for Step 3. *See* Carr. Decl. ¶ 40. "Dr. Venkataraman provides no explanations for these material deviations" from his pattern—indeed, in many cases he does not even disclose them to the Court. *Id.* These deviations—and the failure to disclose them—"cast serious doubt on the reliability of his identification" of episodes. *Id.* ¶ 41.

Again, these issues have implications beyond this case. If the Court concludes that the government has met its burden here and proven fraud based on compliance with just two or three of the government's four steps, then in future civil cases, government agencies will be able to

prove spoofing based only a partial match to a set of "loose parameters" without any corroboration. Especially where everyone agrees that each step on its own can occur in lawful trading activity, the Court should decline to find relevant conduct based on episodes that do not even meet the government's four-step criteria.

In *Chube II*, the Seventh Circuit vacated the defendants' sentences because the district court had improperly assumed that each of 98 instances of drug prescribing was unlawful. *Chube II*, 538 F.3d at 702-06. That "assumption … was not enough to support its findings." *Id.* at 704. Instead, "[f]or a prescription to be included in relevant conduct, the court must evaluate the facts surrounding that particular prescription and explain why those facts render it unlawful." *Id.* at 705. "Generalizing from 'numerous' files will not suffice." *Id.* The government here has presented only a supposed four-step pattern, with no corroborating evidence for any non-trial episodes, to support its assertion that the asserted 1,102 episodes were all unlawful. And even then, the government ignores the pattern in roughly half the episodes. It has not even provided enough evidence to find whole categories of episodes unlawful, much less each individual episode.

Because the government has failed to prove fraudulent intent as to the non-trial episodes, the Court should conclude they are not "relevant conduct" and exclude them from its calculations. This would require deducting approximately $153,984 from the loss calculation. Carr Decl. Ex. 2, *l.* 12.[7]

---

[7] This deduction, and all other deductions that follow, are deductions from Dr. Carr's loss calculations based on the last transaction price, set forth in Exhibit 2 to his declaration. These calculations assume that the government has proven the other elements of actual loss, like loss causation, although we explain below that the government has not in fact met their burden in these respects. If the Court were to use Dr. Venkataraman's $272,505 loss calculation as a starting point rather than Dr. Carr's, the deduction would need to be higher to account for Dr. Venkataraman's erroneous use of the BBO as his but-for price, which inflates his loss calculation across the board. *See infra* at 34-35.

### 2. The Government's Calculations Improperly Incorporate Other Episodes

Setting aside the lack of proof of fraudulent intent, Dr. Venkataraman inflates his calculations by including episodes that should be categorically excluded from the universe of relevant conduct for additional reasons.

**Episodes not involving John.** The government asserts against John episodes in which he was not even involved and, therefore, caused no losses to anyone. The government's theory appears to be that these episodes, transacted by Mr. Bases or Mr. Lakhan, are within the scope of the alleged conspiracy. But the government makes a critical error: At sentencing, a conspiracy alone is not enough to attribute losses to co-defendants.

Conduct is not automatically relevant simply because it comes within the scope of a conspiracy; rather, the government must show—and the Court must find based on the evidence—that (1) the conduct in question was within "the scope of the criminal activity the *particular defendant* agreed to *jointly undertake*," U.S.S.G. § 1B1.3 cmt. n.3(B) (emphases added), and (2) the conduct "was reasonably foreseeable in connection with that criminal activity," *id.* n.3(D). As a result of these additional constraints applied at sentencing, "[c]onspiracy liability … is generally much broader than jointly undertaken criminal activity." *United States v. Soto-Piedra*, 525 F.3d 527, 531 (7th Cir. 2008). For conduct to be jointly undertaken, the defendant must have "assist[ed] or agree[d] to promote" that *specific* conduct. *Id.* at 533; *see also United States v. Davison*, 761 F.3d 683, 686 (7th Cir. 2014) ("In effect the judge and the government equated 'jointly undertaken criminal activity' to conspiracy, and that is incorrect.").

For example, a drug-distribution defendant might join a conspiracy with the goal of "hav[ing] a better shot at obtaining crack that he could resell." *Davison*, 761 F.3d at 686. And it might be that the entire "sale quantity was foreseeable to him," such that he could be accountable

for it under a conspiracy theory of criminal liability. *Id.* But at sentencing, conspiracy and reasonable foreseeability are "not enough." *Id.* Unless the government offers evidence that that particular defendant "agreed to help his co-conspirators achieve a goal of selling [that higher] amount" of drugs, his relevant conduct is limited to his own sales. *Id.*; *accord id.* ("If he neither did nor agreed to do anything to promote sales by the other gang members, their sales … were not relevant conduct of his, even if foreseeable.").

The government has not offered evidence showing that Mr. Bases and Mr. Lakhan's solo trading is relevant conduct as to John: It has not shown that John *in particular* agreed to *jointly undertake* Mr. Bases and Mr. Lakhan's solo trading, nor has it shown that he assisted or agreed to promote that trading in the quantities Mr. Bases and Mr. Lakhan achieved. Even assuming John was aware of that trading activity, "[k]nowledge is not sufficient"; there must be evidence establishing the scope of the defendant's agreement with his co-defendants. *United States v. Salem*, 597 F.3d 877, 889 (7th Cir. 2010). There is no evidence here that John agreed to assist with or promote any of the Bases- and Lakhan-only episodes now asserted against him, much less that he agreed to promote a particular quantity of trading. In light of this failure of proof, the Court should exclude the 330 episodes not involving trading by John, or roughly $35,409, from the loss calculation. Carr Decl. Ex. 2, *l.* 7.

**Garden-leave episodes.** From April 12 to June 11, 2011, John was on "garden leave" from his job at BAML, meaning that he was not allowed to continue his work for BAML or to commence work at MS. Ex. D. John was prohibited from, and did not, engage in any trading activity, and he was forbidden from communicating with his former colleagues, including Mr. Bases. *Id.* Accordingly, the government cannot show that any trading by the co-defendants during this period was jointly undertaken with John. Several of the factors of the "jointly

undertaken" analysis are missing during this period, including "coordination of activities among" the defendants, "pooling of resources or profits," and "knowledge of the scope of the scheme." *Salem*, 657 F.3d at 564; *see also Soto-Piedra*, 525 F.3d at 533 ("Actions of coconspirators that a particular defendant does not assist or agree to promote are generally not within the scope of that defendant's jointly undertaken activity."). The Court should exclude the 37 garden-leave episodes, or roughly $8,645, from the loss calculation. Carr. Decl. Ex. 2, *l.* 13.

**Stale-iceberg episodes.** As described above (at 20), when the Step 1 iceberg order was placed minutes or even hours before the Step 2 alleged spoof order, there can be no reasonable inference that there was a fraudulent intent connecting those two orders. Rather, these independently legitimate orders were much more likely to have been placed for independently legitimate reasons. *See* Carr Decl. ¶ 34. The Court should exclude the 161 episodes in which the Step 1 iceberg order was placed more than five minutes before the next step, or roughly $27,760, from the loss calculation. Carr Decl. Ex. 2, *l.* 8.

**Static-BBO episodes.** In hundreds of the asserted episodes, the BBO—Dr. Venkataraman's measure for the but-for price—did not change during the episode. Thus, in those episodes, the supposed spoof did not cause any artificial price and thus could not have caused any loss. Dr. Venkataraman does not mention this obvious defect in his analysis, much less explain how any loss could be attributed to an episode in which the price was unaffected by the alleged spoofing activity. Moreover, the fact that the BBO did not change in such a large percentage of the sequences identified by the government calls into doubt the utility of the government's four steps in identifying trading that, according to the government, was specifically designed to influence market price. At minimum, the Court should exclude these 355 episodes, or roughly $11,295, from the loss calculation. Carr Decl. Ex. 2, *l.* 10.

**Non-iceberg executions.** Dr. Venkataraman includes in his loss calculation nearly a dozen episodes in which the defendants executed a non-iceberg order on the execution side during the episode. In such episodes, any claim of fraudulent intent is belied by the defendants' legitimate, non-iceberg trading on the execution side. The Court should exclude these 11 episodes, or roughly $3,215, from the loss calculation. Carr Decl. Ex. 2, *l.* 11.[8]

### B. The Court Should Reject Dr. Venkataraman's Loss Calculation Methodology And Refuse To Impose Any Loss Enhancement Under § 2B1.1(b)

Regardless of the universe of "relevant conduct" for sentencing, the Court should not apply *any* loss enhancement under § 2B1.1(b). First and foremost, the government has not proven that any of its asserted episodes caused losses to any of the parties involved. § I.B.1. Dr. Venkataraman does not even purport to establish causation; he merely describes it as possible and proceeds to assume it. In any case, the government's causation theory violates Supreme Court precedent on market fraud and loss. On the current record, loss cannot be reasonably calculated, and to the extent the Court concludes it must identify a loss amount, it should use Mr. Pacilio's gain as a proxy for losses, *see*, *e.g.*, *United States v. Coscia*, 866 F.3d 782, 801-02 (7th Cir. 2017), § I.B.2, and not rely on intended losses, § I.B.3.

Alternatively, as discussed below, the Court should reject Dr. Venkataraman's methodology and deduct from his loss calculations as necessitated by the countervailing analysis of defense experts Dr. Carr and Dr. Jeremy Cusimano. The government has not applied a reliable approach to determining the "but-for" price that would have prevailed in the market absent the asserted spoof orders—a threshold figure necessary to calculate the losses for any given trading episode. § I.B.4. The government's "best bid or offer" figure is not a fair or reliable baseline; it

[8] The calculations in this section do not take into account overlap between categories of excludable episodes. Thus, the total amount that should be excluded from the loss calculation is not the sum of the separate exclusions set out in this submission.

is a "worst case" outcome for John that ignores economic principles and thereby exaggerates losses dramatically. To the extent the Court determines that any loss enhancement applies, it should use the last transaction price as the but-for price—a methodology that draws upon actual evidence of execution prices in the market, rather than unsupported speculation that irrationally applies the "worst case" outcome in every instance. At minimum, the Court should compel production of the government's episode-by-episode calculations and hold an evidentiary hearing before making any decision as to loss calculation. § I.B.5. The government's expert did not produce his episode-by-episode calculations, did not testify at trial, and offered speculative theories that have never been subjected to cross-examination. This case presents a classic battle of the experts that can only be resolved by production of the underlying data, credibility assessments derived from live testimony, and the resolution of substantial factual disputes as to the loss calculations.

### 1. The Government Has Not Proven Causation

In addition to proving that the trading episodes in question in fact involve relevant unlawful conduct, the government bears the burden to prove that the asserted losses are "attributable to," i.e., caused by, the relevant conduct. *United States v. Schroeder*, 536 F.3d 746, 752 (7th Cir. 2008); *see also id.* at 755 (describing the "serious error" of failing to "hold the government to its burden" of showing that "unlawful conduct caused" the losses). Again, this is a threshold question before losses can be quantified under § 2B1.1.

The government's expert does not even try to establish causation. Instead, he repeatedly—and carefully—couches his causation statements in possibilities, explaining that spoofing "*can* induce" other market participants to trade and that such participants "are harmed *to the extent that* they were induced to trade by the spoofing pressure." Venkataraman Decl. ¶ 12 (emphases added); *accord id.* ¶ 23 ("can induce", "to the extent"); *id.* ¶ 37 ("can induce"); *id.* ¶ 45 ("the extent to which market participants may have been harmed"). But the Court's task—and the government's

burden—is to determine by a preponderance of the evidence what more than likely *did* occur, not what *could* have *possibly* happened. As the Seventh Circuit has explained, to support a "finding … based on expert evidence, the expert must signify a *probability* supported by some rational basis; mere *possibilities* will not suffice." *Jastremski v. United States*, 737 F.2d 666, 671 (7th Cir. 1984) (quotation marks omitted). As Dr. Carr explained, and as is demonstrated on the face of Dr. Venkataraman's report, he "simply assumes, but fails to show, that the Alleged Spoofing Sequences caused harm to other traders." Carr Decl. ¶ 49. The government's evidence plainly fails to pass the applicable standard and satisfy its burden.

Beyond the government's evidentiary problems, its theory has another flaw: It disregards governing Supreme Court precedent and economic realities. The government's loss theory is that *every* trader who executed *any* trade while an alleged spoof order was in the market suffered a loss. According to the government, all trading during that period took place at an artificial price, and those artificial prices should be deemed to have caused losses.

The Supreme Court has rejected that very theory: "[A]s a matter of pure logic, at the moment the transaction takes place [at an inflated price], the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). That one snapshot, at the instant of the transaction, cannot on its own establish loss. If the trader sells the share (or futures contract) before an alleged misrepresentation is brought to light, when prices are still inflated, "the misrepresentation will not have led to any loss." *Id.* If he sells after a price correction, the "initially inflated purchase price *might* mean a later loss," but that later "lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events"—making it "more likely

that other factors caused the loss." *Id.* at 342-43. In sum, not all trading at artificial prices leads to loss, and whether an artificial price caused a loss can only be evaluated by looking both the buy and sell side of the alleged victim's trading.

The government and its expert attempt to do exactly what *Dura* prohibits: analyze trading losses based solely on the supposedly artificial prices on one side of the market in the instant of the transaction. Dr. Venkataraman makes no effort to distinguish the traders who got out of the market while the spoof order was still active (and therefore were categorically not harmed under *Dura*, Carr Decl. ¶ 50) from those who did so after the alleged spoof was removed (who *might* have been harmed under *Dura*). And he does not establish that any losses were caused by the alleged spoof order as opposed to the other market forces discussed in *Dura*.[9] Nor could he. "[C]ausal losses are measured by the amount the share price was inflated when [the trader] bought the stock minus the amount it was inflated when he sold it." *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 415 (7th Cir. 2015). But there is no data in this case about the prices that prevailed when traders got out of the market—minutes, hours, or even days after the government's data and analysis ends—and, accordingly, no way to calculate losses that is consistent with *Dura*. The Seventh Circuit has articulated this principle uncontroversially: The government here only provides the first piece of the puzzle, without ever identifying—much less analyzing—the price that prevailed when the alleged victims bought or sold after the alleged spoof order was canceled. *See id.* at 421; *Dura*, 544 U.S. at 343 (holding that a showing of an "inflated purchase price" "is insufficient" to show loss causation). Similar analytical shortcomings recently doomed the civil

[9] Dr. Venkataraman's analysis of the rate of spread-crossing does not fill in the logical gap, "because alternative explanations are not considered." Carr Decl. ¶ 70.

class-action that arose from the conduct at issue here. *See Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*, 41 F.4th 71, 77-83 (2d Cir. 2022).

That *Dura* was a civil securities-fraud case is immaterial. Its reasoning applies with equal force in the sentencing context, as several Circuits have recognized. *E.g.*, *United States v. Nacchio*, 573 F.3d 1062, 1078-79 (10th Cir. 2009); *United States v. Rutkoske*, 506 F.3d 170, 179 (2d Cir. 2007); *United States v. Olis*, 429 F.3d 540, 546 (5th Cir. 2005). The Court's loss causation task for sentencing purposes—as for civil securities-fraud purposes—must be to "take[] seriously the requirement to correlate the defendant's sentence with the actual loss caused in the marketplace, exclusive of other sources of stock price decline." *Olis*, 429 F.3d at 547. Where other market forces cause changes in price, there "is not a 'loss' attributable to the misrepresentation." *Id.* at 546; *accord Rutkoske*, 506 F.3d at 179 ("[L]osses from causes other than the fraud must be excluded from the loss calculation." (quoting *United States v. Ebbers*, 458 F.3d 110, 128 (2d Cir. 2006))). And a loss methodology is fatally flawed when, as here, it does "not adequately account for the possibility that … nonfraud related information may have affected" prices. *Glickenhaus*, 787 F.3d at 423; *see also United States v. DISH Network L.L.C.*, 954 F.3d 970, 974 (7th Cir. 2020) ("[R]ecovering damages for a violation of the securities law depends on establishing that the fraud caused a loss, not just caused the transaction in which a loss occurred."). The government's shortcomings here are even worse than in *Olis* and *Rutkoske*. It has not even attempted to prove causation, just leaving it open as a possibility. And it overlooks entirely *Dura*'s teaching that buying at an inflated price is not, on its own, a loss. For this reason alone, the Court must reject the government's proposed loss enhancement.[10]

[10] The government argued to Probation that its loss calculation was "likely underinclusive" because it did not account for "market impacts" in "correlated markets." U.S. VOF at 5. The

**2. At Most, The Court Should Use Gain As A Proxy For Actual Loss**

The government's burden for the loss enhancement is to "prove … a reliable, reasonable estimate" of the loss. *United States v. Gordon*, 495 F.3d 427, 431 (7th Cir. 2007) (quotation marks omitted). For the aforementioned reasons, the government has not carried that burden in this case, and any actual losses cannot reasonably be calculated. In an earlier spoofing case in this district, the government correctly conceded (and the district court found) that "losses could not be calculated reasonably." *Coscia*, 866 F.3d at 801. To the extent it determines a loss enhancement is warranted, the Court should follow the approach ordained by *Coscia* and use gain as a proxy for losses. *See* U.S.S.G. § 2B1.1 appl. n.3.

The "gains" here can be viewed as the losses of direct counterparties in the trading episodes presented at trial on which Mr. Pacilio was convicted. *See supra* at 18-23 (defining proper scope of relevant conduct for sentencing). Dr. Venkataraman offers no estimate of gain, but per Dr. Carr's analysis, the amount of gain related to the trial episodes is $7,325. Carr Decl. Ex. 2, *l.* 16a. Even under the government's parameters (i.e., reflecting all 1,012 asserted episodes) the appropriate gain calculation is $69,452. Carr Decl. Ex. 2, *l.* 6a.

**3. Intended Loss Is Not A Substitute For Actual Loss**

The government urges application of the loss enhancement because of "the actual loss amount" in the case. U.S. VOF, at 9. For all the reasons described herein, the government has not shown that anyone lost money at all, much less as a result of unlawful trading. And the trial highlighted examples where alleged victims stood to profit from John's alleged spoofing. *See,*

---

deficiencies in the government's showing of causation noted above apply with even more force to correlated markets. In sum, the government's loss calculation is not "underinclusive"; this is empty rhetoric ignoring the government's burden of proof to show causation.

*e.g.,* Tr. 1471-72. As it stands, the government offers a theoretical loss amount—one plagued with methodological problems that does not support any reasonable estimate of actual loss.

The government nowhere invokes the possibility that an enhancement should apply on the basis of intended (rather than actual) loss. But should the government belatedly assert an intended-loss theory, the Court should reject it for three reasons.

First, as discussed above, the government has not offered any evidence at sentencing that establishes John had fraudulent intent with respect to the asserted episodes, so they are not "relevant conduct" that may be included in the loss calculation at sentencing, whether for actual or intended loss. *Supra* at 17-27. For the same reasons, the government fails to offer sufficient evidence that John intended any losses, especially to parties with whom he never transacted.

Second, whether taken as a measure of actual or intended loss, the government's loss calculations do not reflect a reliable or reasonable estimate of any loss amount, as described throughout this submission and by Dr. Carr.

Third, the Court should refuse to apply the Guidelines commentary's "intended loss" interpretation. The Guideline text mentions only "loss." U.S.S.G. § 2B1.1(b)(1). As the Supreme Court recently explained in *Kisor*, courts cannot defer to an agency's interpretation of its own regulation until after "exhaust[ing] all the 'traditional tools' of construction" and concluding that "genuine ambiguity remains." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019). As several courts have now recognized, the *Kisor* rule means that the Guidelines commentary cannot expand the Guidelines text beyond its ordinary meaning. *United States v. Banks*, No. 19-3812, -- F.4th --, 2022 WL 17333797, at *5-7 (3d Cir. Nov. 30, 2022); *United States v. Riccardi*, 989 F.3d 476, 481-89 (6th Cir. 2021); *United States v. Havis*, 927 F.3d 382, 384-87 (6th Cir. 2019) (en banc) (per curiam); *United States v. Winstead*, 890 F.3d 1082, 1092 (D.C. Cir. 2018). The Seventh Circuit

has previewed this issue and explained that, post-*Kisor*, courts are "under no obligation to accept the application note[s] as a reasonable interpretation of the guideline[s]." *United States v. Consuegra-Rojas*, No. 21-2606, 2022 WL 356375, at *1-2 (7th Cir. Feb. 7, 2022).

Applying these principles, as the Third Circuit recently concluded, the Commission's "intended loss" interpretation of § 2B1.1(b)(1) is entitled to "no weight." *Banks*, 2022 WL 17333797, at *7. The Guidelines' use of "loss" has an ordinary meaning that does not reasonably include "intended loss." *Id.* at *6-7 (collecting definitions). "[T]he ordinary meaning of the word 'loss' is the loss the victim *actually* suffered." *Id.* at *7 (emphasis added). Not intended loss, or possible loss, or theoretical loss—actual loss. The government here has offered only theories, and its loss calculation should thus be rejected.

#### 4. The Government Uses An Unreliable But-For Price

If the Court determines that losses can be reasonably calculated, it should reject Dr. Venkataraman's estimate, which is predicated on a flawed approach to determining the price at which participants supposedly would have transacted but for the alleged spoofing episodes. As Dr. Carr explained, determining the "'but-for' price is critical to Dr. Venkataraman's loss analysis because it is the baseline from which he determines purported losses for each trade." Carr. Decl. ¶ 54.

Dr. Venkataraman used the best bid or offer price ("BBO") immediately before an alleged spoofing episode as his baseline. But the BBO does not reflect "transaction prices at which actual trades took place; rather, they are aspirational prices at which traders on each side of the market were hoping to transact." *Id.* Absent the alleged spoof order, traders would not have necessarily transacted at their "best case" prices. The use of the BBO is accordingly "not an accepted or reliable methodology in economic analysis" for identifying but-for prices. *Id.*; *see id.* ¶ 56 (calling BBO "unreliable"). Dr. Carr's Declaration offers examples of why these aspirational prices are

improper estimates of the but-for price. *Id.* ¶¶ 59-67. And as Dr. Carr explains, Dr. Venkataraman's adjustments do not make up for the BBO's shortcomings. *Id.* ¶¶ 68-77.

Instead of the aspirational BBO pricing, economists and regulators use the last price at which participants *actually traded* to estimate the but-for price. *Id.* ¶¶ 55-56 & n.25 (citing U.S. SEC, *Market Activity Report Methodology* (updated Mar. 25, 2021), https://tinyurl.com/3x75xj83). The last transaction price is one of "two accepted methods" used in the field because it is an "actual transaction price[] willingly entered between two arm's-length parties." *Id.* ¶ 56.[11] "This is especially true in this analysis because the most recent previous transaction is, on average, only two seconds prior to the start of the [episode]." *Id.*

In sum, Dr. Venkataraman's use of BBO as his baseline is contrary to industry standards and does not provide a "reasonable estimate of the loss" here. § 2B1.1 Application Note 3(C). In the event the Court determines that losses can be reasonably calculated and credits Dr. Venkataraman's methodology at all (despite the numerous reasons not to as described above, including that the government has not established loss causation), the Court should at a minimum use the last transaction price—the more reliable and accepted measure—instead of the BBO price. Making just this one change to the government's loss calculations, while keeping all of the government's other parameters the same, reduces the loss amount from $272,505 to $191,984. Carr Decl. Ex. 2, *l.* 6. Limiting the calculation to the trial episodes—as is required for the reasons explained above—would reduce this figure to $38,000 in losses, and further limiting the calculation to counterparties in those episodes would reduce the calculation to $7,325. Carr Decl. Ex. 2, *l.* 6, 12, 16a.

[11] The other accepted method is the *mid-point* of the BBO. *Id.* ¶ 57.

### C. The Court Should Reject The Government's Calculations For Lack Of Sufficient Data And Order An Evidentiary Hearing

The government has not offered sufficient data for the defense to recreate its calculations, verify them, or for the Court to adopt them as its own findings. Dr. Venkataraman has not identified the specific orders that he alleges were spoof orders, nor has he provided loss amounts episode by episode. And because Dr. Venkataraman failed to identify loss amounts for individual episodes, there is no way to even check the most fundamental arithmetic—i.e., that he accurately summed the episode-by-episode amounts to arrive at his bottom-line loss figure. Even simple data-entry errors cannot be ruled out without knowing what numbers Dr. Venkataraman was adding together. This opacity has frustrated the defense's attempts to examine and challenge Dr. Venkataraman's calculations, and it makes impossible the Court's obligation to assess those calculations for itself.[12]

Without the data necessary to validate and challenge Dr. Venkataraman's calculations, the Court should reject any loss enhancement. *E.g.*, *Chube II*, 538 F.3d at 703 (vacating sentence where the district court "simply t[ook] the data in the Government's spreadsheets and duplicate[d] the figures as the findings"). In the alternative, we renew our motion to compel production of the additional data withheld by the government—data that would permit counsel to mount a complete defense to the government's loss analysis. The Court's acceptance of the government's

[12] Another example underscores the problems resulting from this lack of data. Two types of data records are generally available for trading activity in the CME: RAPID data and Armada files. The BBO data from which Dr. Venkataraman derives his but-for prices is contained *only* in the Armada files, not the RAPID data. But for 265 of the asserted episodes (all involving Mr. Bases), no Armada data exists. Accordingly, no BBO numbers can be determined, and under Dr. Venkataraman's approach, no but-for price can be identified. Again, Dr. Venkataraman does not even mention this deficiency, much less explain how he could calculate losses for those episodes without that concededly essential data point.

calculations without production of the underlying data would violate due process and overlook the Court's independent truth-seeking obligations as factfinder.

In addition, the Court should order an evidentiary hearing to take testimony from the parties' experts. Dr. Venkataraman did not testify at trial and, as a result, his theories and calculations have never been subjected to the adversarial testing that is essential to our system of criminal justice. *See, e.g.*, *California v. Green*, 399 U.S. 149, 158 (1970) (describing cross-examination as "the greatest legal engine ever invented for the discovery of truth" (quoting 5 Wigmore, *Evidence* § 1367 (3d ed. 1940))). The dueling expert opinions on issues of loss calculation create a material factual dispute that the Court cannot resolve without the benefit of live testimony, cross-examination, and the opportunity to determine the credibility of the various experts. *See, e.g.*, *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (explaining that even if "'shaky' expert testimony" is admissible, it must be "assailable by its opponents through cross-examination"); *Hall v. Quarterman*, 534 F.3d 365, 372 (5th Cir. 2008) (per curiam) (vacating habeas denial where district court's failure to hold an evidentiary hearing meant that "conflicting expert opinions" were "unaired in court and shielded from cross examination"); *Soria v. Ozinga Bros.*, 704 F.2d 990, 994 n.6 (7th Cir. 1983) (explaining that, when faced with "a Babel of competing experts [and] contradictory statistical demonstrations," district courts must "assess[] … the credibility of … expert witnesses"); *Proffitt v. Wainwright*, 685 F.2d 1227, 1254 (11th Cir. 1982) ("Where expert witnesses are employed, cross-examination is even more crucial to ensuring accurate fact-finding."). A live evidentiary hearing to assess credibility is especially important here where, as described above (at 22, 26), Dr. Venkataraman's declaration repeatedly conceals important facts that are essential to his analysis.

*   *   *

As demonstrated above, the government's loss-calculation analysis is fatally flawed. It has failed to prove fraudulent intent and loss causation, and no loss enhancement should apply. Before even considering the application of the government's proposed loss enhancement to John, at the very least the Court should compel production of Dr. Venkataraman's data and calculations and hold an evidentiary hearing.

Even assuming the Court could overlook the core deficiencies plaguing the government's loss calculations, its expert inflates his calculations by using an economically defective but-for price, by including parties who did not transact with the defendants, and by including episodes that should be categorically excluded. Reducing the government's calculations to account for all of these improper inflations, the loss amount is roughly $7,325, Carr Decl. Ex. 2, *l.* 16a, and the largest enhancement that could apply is two points, U.S.S.G. § 2B1.1(b)(1)(B).

**D. No Other Sentencing Enhancements Apply**

In its Statement of the Offense submission to Probation, the government disclosed its intention to seek Guidelines enhancements under § 3B1.1 (leadership enhancement), § 2B1.1(b)(10) (sophisticated means enhancement), and § 2B1.1(b)(7) (10 or more victims). None of these enhancements apply here.

**1. The Section 3B1.1 Leadership Enhancement Is Unsupported**

The Court should refuse to add two offense levels to John's Guidelines calculation by mischaracterizing him as "an organizer, leader, manager, or supervisor in the criminal activity" under § 3B1.1. As made clear by the Sentencing Guidelines and relevant caselaw, a person who learned merely by watching the actions of another does not warrant a § 3B1.1 enhancement. Probation agrees that this enhancement is inapplicable. PSR ¶ 44.

The basis of the § 3B1.1 enhancement, the government claims, is contained in "Lakhan's testimony on this point, chats and trading data introduced into evidence during trial show[ing] that

Pacilio instructed and coached Lakhan how to spoof." U.S. VOF at 10. But the trial record belies this contention.

John did not instruct Mr. Lakhan to spoof. John did not even encourage Mr. Lakhan to spoof. Rather, Mr. Lakhan learned to spoof solely "by watching" trading on the electronic trading platform, Tr. 626, 648-49, 829-30, 889, and then made the decision—on his own—to spoof, Tr. 889. If anything, the evidence shows that John *discouraged* Lakhan from spoofing. *See* Tr. 1059 (discussing GX83: "Don't spoof it.").

The Bloomberg chats entered into evidence during trial similarly do not illustrate Mr. Pacilio as maintaining a leadership or authoritative role. The government attempts to show Mr. Pacilio helping Mr. Lakhan spoof on February 11, 2011. U.S. VOF at 10 (citing GX 83 at 5: "dont do it yourself. i will help you."). But the government selectively omits the rest of the message, which reads: "*dont* spoof it." GX 83 at 5 (emphasis added). This chat cannot plausibly read as John teaching or instructing Mr. Lakhan to spoof; precisely the opposite.

The Seventh Circuit interprets § 3B1.1 to require a defendant to "have control over at least one other participant in order to be subject to an offense level increase under § 3B1.1." *United States v. Fones*, 51 F.3d 663, 669 (7th Cir. 1995). That is not the case here. As Probation observed, John had no managerial oversight of Mr. Lakhan. PSR ¶ 44. John and Mr. Lakhan shared similar roles (precious metals futures contracts traders) at the same financial institutions (BAML and Morgan Stanley), although they worked in different offices. Tr. 596-97. John and Mr. Lakhan reported to the same desk supervisor (Mr. Amrik Sandhu). Tr. 694. At worst, John answered the questions of his less experienced colleagues when asked for help.

Moreover, section 3B1.1(c) requires that the defendant "must have been the organizer, leader, manager, or supervisor of one or more other participants" *in criminal activity*. *United*

*States v. Lovies*, 16 F.4th 493, 506 (7th Cir. 2021) (quotation marks omitted). At no point did John's role cross this threshold. Assisting colleagues at work because you have more relevant work experience is not tantamount to instructing, supervising, or leading a criminal conspiracy.

Thus, as Probation found, the government's Guidelines § 3B1.1 leadership enhancement is inappropriate as applied to John, who did not act as an "organizer, leader, manager, or supervisor" during the conspiracy period.

**2. The Section 2B1.1(b)(10) Sophisticated Means Enhancement Is Unsupported**

The Court should refuse to apply a sentencing enhancement based on the alleged "sophistication" of the fraudulent scheme and Mr. Lakhan's presence in London. The testimony of Mr. Lakhan, the government's cooperating witness, directly belies the contention that the charged scheme was either sophisticated or committed in "substantial part" "from outside of the United States." § 2B1.1(b)(10). Probation agrees that this enhancement is inapplicable. PSR ¶ 40.

The scheme charged here involved manual trading in a market full of sophisticated algorithmic traders. As Probation observed, John used comparatively elementary means in this context, not sophisticated ones. PSR ¶ 40. And as a matter of law, the inquiry into sophisticated means is a *relative* one: "The enhancement is warranted when the … offense, viewed as a whole, shows a greater level of planning or concealment than typical fraud of its kind." *United States v. Harris*, 791 F.3d 772, 781 (7th Cir. 2015); *United States v. Laws*, 819 F.3d 388, 393 (8th Cir. 2016) (question is "relative sophistication"). The genre of fraud at issue here is spoofing, and the charged spoofing scheme here was relatively unsophisticated. In stark contrast to the high-speed trading algorithms and other advanced trading functionality common to the futures markets, the form of trading utilized by John in the alleged scheme stands at the lowest end of technological sophistication: manual trading. PSR ¶ 40. Treating as sophisticated John's placement of manual,

point-and-click orders—in a futures market filled with professional traders using high-speed machines programmed by people with PhDs—would swallow the "relative sophistication" rule. Then, the enhancement would apply in every case involving futures trading, regardless of the relative sophistication of different trading conduct. That is not the approach intended by the Guidelines or adopted by *Harris* and *Laws*.

Furthermore, the government's own witness Mr. Lakhan explained that John's spoofing was not sophisticated; he testified that it was "easy to spot" and "easy to detect" for "anyone with even basic training." Tr. 831-32. So unlike in other cases applying the "sophisticated means" enhancement, John made no effort (much less a sophisticated one) to conceal his pattern of trading activity the government now casts as fraudulent. *Cf. Harris,* 791 F.3d at 781 (collecting cases); *United States v. Ghaddar*, 678 F.3d 600, 601 (7th Cir. 2012) (same). Indeed, if John's conduct had indeed involved sophisticated means, Mr. Lakhan could not have so easily taught himself to employ them.

As for conduct outside the United States, the trial evidence does not support a finding that Mr. Lakhan was part of any unified spoofing scheme with John and Mr. Bases, and Mr. Lakhan's foreign activities are therefore not chargeable against John for purposes of this enhancement. Instead, as noted above, Mr. Lakhan learned to spoof by watching other traders and decided *on his own* to imitate that trading. *See supra* at 39. The fact that Mr. Lakhan made the independent decision to spoof at the same time the government charges John with spoofing does not make them part of a shared scheme. *Cf. United States v. Evans*, 970 F.2d 663, 670 (10th Cir. 1992) ("similar or parallel objectives between similarly situated people" do not necessarily establish a joint undertaking). At any rate, even if Mr. Lakhan is considered a part of the scheme, his conduct in London cannot plausibly be found to be a "substantial part" of the charged scheme: The

government's expert identifies only *nine* supposed spoofing sequences involving both John and Mr. Lakhan, out of the 1,102 total sequences attributed to John—so less than 1 percent of such sequences involve conduct outside of the United States. *See* Venkataraman Decl. Attach. B. With respect to the universe of relevant conduct for sentencing purposes—namely, the 27 trial episodes—only 2 involve both John and Mr. Lakhan. GX1, 21. Either way, as Probation observed, Lakhan accounts for a trivial part of the episodes asserted against John, not a substantial one, so Mr. Lakhan's foreign activities cannot on their own support this enhancement. PSR ¶ 40.

### 3. The Section 2B1.1(b)(7) "10 or More Victims" Enhancement Is Unsupported

The Court should refuse to add two offense levels to Mr. Pacilio's Guidelines calculation under § 2B1.1(b)(7) for the number of victims. The government cites a large number of "unique traders" and "firms" that were apparently active in the commodities market during the 1,012 sequences it invokes, but these irrelevant statistics are a distraction from the government's failure of proof on the material elements of this enhancement.

#### a. Failure Of Proof In Dr. Venkataraman's Declaration

A "victim" for purposes of § 2B1.1(b)(7) is defined as "any person who sustained any part of the actual loss determined under subsection (b)(1)," that is, the loss calculation. § 2B1.1(b)(7) cmt. n.1. And the victim count is limited to "relevant conduct" as defined in § 1B1.3(a). *See supra* at 18; *see also, e.g.*, *United States v. Salahmand*, 651 F.3d 21, 26 (D.C. Cir. 2011) (discussing similar § 3A1.1(b)(1) enhancement). Dr. Venkataraman's declaration is woefully inadequate to support the enhancement on both scores.

*First*, his analysis lacks the requisite connection to the "relevant conduct" for sentencing. The government and Dr. Venkataraman argued for this enhancement to Probation solely on the ground that some 1,384 unique traders at 235 unique firms were active in the market at some point

during the 1,672 alleged spoofing sequences attributable to either John or his co-defendant Edward Bases while the supposed spoof order was open. *See* Venkataraman Decl. ¶ 27. But even the government does not contend that all 1,672 are relevant conduct as to John. Rather, it asserts a smaller universe of 1,012 sequences against him. Even assuming that "unique traders" and "unique firms" were metrics relevant to the victim enhancement (and for reasons explained below they are not), the government provides no breakdown of the traders and firms involved in the sequences it claims are relevant to John. This evidentiary failing dooms the application of this enhancement right off the bat.

Further, as explained above, the fact that the government *asserts* a sequence as relevant conduct for purposes of sentencing does not make it so. The government has not proven fraudulent intent with respect to the overwhelming majority of sequences (i.e., the non-trial sequences), and those sequences are not properly considered relevant conduct attributable to John. *See supra* at 17-27. Without proof of fraudulent intent as to those sequences, there can be no "victims" for purposes of the § 2B1.1(b)(7) enhancement. And the government does not provide any breakdown to support its flawed victim count by sequence, so there is no way to evaluate how many of its supposed victims were involved in sequences properly considered for sentencing purposes—namely the trial episodes.

*Second*, even setting aside what constitutes "relevant conduct," under § 2B1.1(b)(7), "victims" are those who sustain actual loss. And the government has not proven any "actual loss" for the reasons stated above. *See, e.g.*, *United States v. Skys*, 637 F.3d 146, 154 (2d Cir. 2011) ("Without any determined amount of actual loss … , the district court inappropriately included the institutions as victims under § 2B1.1(b)(2)."); *supra* at 27-31. Even with respect to John's counterparties, the government has not proved actual loss, because it does not evaluate both the

buy and sell side of the counterparty's trading to see if the counterparty was able to both buy and sell at the supposedly artificial price, as instructed by the Supreme Court in *Dura*. *See supra* at 29-31.

*Third*, and relatedly, the trial record shows that commodities traders do not necessarily trade on their own behalf with their own money; they often act as agents for other people—their customers or clients. *See infra* at 54; *see also e.g.,* Tr. 763, 773-74, 777. But the person who sustained the actual loss, and therefore the "victim" for purposes of § 2B1.1(b)(7), is the *principal*, i.e., the client, "not the agent" trader. *Cf. United States v. Brunson*, 54 F.3d 673, 676 (10th Cir. 1995) (addressing similar victim enhancement). And Dr. Venkataraman has introduced no evidence whatsoever of how many different clients John's counterparties were trading for during the trading sequences introduced at trial, which is the relevant question here. For all we know, the counterparties in the transactions were trading on behalf of fewer than 10 unique clients, because some of the traders share clients.

In sum, the government's statistic that 1,384 unique traders at 235 unique firms were active in the market at the relevant time is a red herring, irrelevant to the number of victims who sustained actual loss. On the relevant question, the government has submitted no evidence whatsoever. The government's proof on the enhancement fails for this reason alone.

**b. Failure Of Proof In The PSR**

Perhaps seeking to cure some of these evidentiary flaws, the government apparently provided additional information to Probation that it did not disclose to the defense in its Version of the Offense, Dr. Venkataraman's declaration, or otherwise: The PSR says that the AUSA "reports" that ten specific entities supposedly suffered financial loss. PSR ¶ 26. After seeing this new disclosure in the PSR, counsel for the defense promptly reached out to the government to request substantiation for the government's assertion. In particular, the defense asked the

government to identify the trading sequence or sequences which resulted in financial loss to the identified victims. The government refused the request.

This Court should disregard the PSR's enumeration of these ten entities in evaluating the application of this enhancement. The AUSA's unsworn statements to Probation are not evidence. *See, e.g., United States v. Hawkins*, 76 F.3d 545, 550-51 (4th Cir. 1996) (unsworn AUSA statements in court are not evidence); *Kulhawik v. Holder*, 571 F.3d 296, 298 (2d Cir. 2009) (unsworn attorney statements in briefs are not evidence). And the government has refused to provide the defense any of the underlying evidence that would prove its assertion to Probation.[13]

**c. Failure Of Proof In Trial Record**

The only remaining evidence is that presented at trial with respect to the trial sequences—which as explained above, is the universe of conduct properly attributable to John for purposes of sentencing. *See supra* at 17-27. At trial, the government presented evidence from representatives of only two purported victims, Citadel Securities and Susquehanna. Tr. 1408, 1479. While the trial testimony showed that Susquehanna was a "proprietary trading firm" that "trade[d] with its own money," Tr. 1408-09, there was no such testimony about Citadel Securities—much less the other eight trading firms on which the government now seeks to include in its tabulation. Thus, the trial evidence shows at most only one potential victim for purposes of sentencing. *But see*

[13] Even setting that issue aside, the new disclosure does not cure the problems addressed above. For example, the record does not allow the defense—or the Court—to determine whether these ten entities suffered loss in connection with trading episodes that are appropriately included as "relevant conduct" for sentencing. *See supra* at 17-27. In other words, the fact that the PSR lists ten victim names never previously disclosed to the defense does not overcome the problems identified in the foregoing paragraphs. If anything, the government's refusal to disclose the evidentiary basis for their assertion amplifies the problem. Having refused the defense's request to identify the particular trading sequences in which these ten alleged victims were involved, the government should not be permitted to do so in its responsive submission in a belated attempt to cure the glaring deficiencies in its already-untimely disclosure.

*supra* at 29-31 (someone who benefits from artificial price suffer no actual loss and is not a victim). That is plainly insufficient to warrant the § 2B1.1(b)(7) enhancement.

The government will no doubt ask that the Court simply assume that John caused actual loss to more than 10 unique clients based on the number of trading sequences here. But the enhancement's application must be "made based on reliable evidence rather than speculation." *United States v. Nelson*, 774 F.3d 1104, 1107 (7th Cir. 2014) (quotation marks omitted). Here, the government offers nothing more than *ipse dixit* and erroneous reasoning to support it claims that 10 victims suffered actual financial loss—particularly when the universe of relevant conduct is appropriately limited to the trial episodes. The Court should accordingly decline to apply the § 2B1.1(b)(7) enhancement.

### E. The Applicable Guidelines Range

In light of the foregoing, John's Guidelines range should be calculated as follows. Under § 2B1.1(a)(1), the base offense level is 7. Under § 2B1.1(b)(1)(G), the offense level is increased by 0 levels because the government has not demonstrated any reasonable way to estimate losses and there are no other applicable enhancements, as explained above. John has no criminal history, and under § 4A1.1(a) is accordingly in criminal history category I. Based on the foregoing, with an offense level of 7 and a criminal history category I, John's sentencing range under the Guidelines is between zero and six months of imprisonment.

## II. A Balanced Consideration Of The Section 3553(a) Factors Supports A Sentence Of Home Confinement

According to the PSR, the applicable Sentencing Guidelines range here suggest a term of imprisonment between 37 and 46 months. That Guidelines calculation is wrong for the reasons stated above. But even if that Guidelines range is technically correct, it produces a result that is far more than what is necessary to serve the aims of criminal punishment in this context. Even

Probation agrees; notwithstanding its inflated Guidelines calculation, it recommends a below-Guidelines sentence of 12 months and one day. We respectfully submit that the § 3553(a) factors support a non-custodial sentence up to and including supervised release and home confinement.

### A. The Nature and Circumstances Of The Offense Weigh In Favor of Lenience

#### 1. Contemporaneous Evidence From 2009-2014 Shows The Status Of Spoofing Was At Least Ambiguous, Reducing Relative Culpability

The offense conduct occurred in the midst of a radical shift in the futures markets, with the rising dominance of automated trading programs using order types and speeds that literally rendered their orders invisible to human traders. The trial evidence and reems of publicly available literature detail how sophisticated trading firms used their exceptional technological advantage and superior speed to front-run manual traders in ways that made it more difficult for manual traders to achieve executions at desired prices and effectively turned their resting orders into insurance policies for any front-running traders that sought to exit the market at the first sign of adverse market conditions. To be sure, automatic traders exploiting their technological advantage at the expense of other traders does not justify illegal conduct. But prior to the effective date of Dodd-Frank's prohibition on spoofing—July 16, 2011—the rules of the road were unclear.

As this Court is aware, John has argued that the conduct charged by the government does not fall within the scope of the wire and commodities fraud statutes as a matter of law. He has also argued that even if such conduct could be viewed in retrospect to fit within the statutory definition of fraud, his conviction under the circumstances of this case violates due process. Although the Court ultimately found that these arguments did not constitute a complete defense to criminal liability, they certainly bear on John's relative culpability for purposes of sentencing.

In advance of trial, the defense offered extensive evidence from the government's own witnesses and other alleged counterparty traders demonstrating that CME orders communicated

only the objective details of the orders themselves—commodity terms, quantity, direction, and price—and nothing about the subjective intent. *See*, *e.g.*, Dkt. 500, at 5 (citing Ackley, Carroll, Lehman, O'Murchu, and Karos declarations). And, as the government's witnesses (and purported victims) explained, their trading algorithms did not consider that subjective intent, precisely because they could not do so based on the mere objective information conveyed by an order. *Id.* at 4 (citing Varner, Twells, and Pettey declarations). Collectively, these witnesses had over a century of trading experience, and their firms were alleged to be the counterparties in roughly 75% of the trial episodes.

The defense also offered three expert witnesses who agreed with the traders' conclusions. As they explained, futures orders "did not communicate any other information or convey any implied representations about the intent of the traders who placed such orders." *Id.* at 6 (quoting Markham declaration). A range of industry organizations expressed agreement, describing the government's implied-representation theory as "novel" and "protean," demonstrating that even if the defendants' conduct could technically fall within the wire-fraud statute, there was no contemporaneous reason in the industry to think that the conduct was indeed fraudulent. *Id.* at 7 (citing Futures Industry Association, Securities Industry and Financial Markets Association, Bank Policy Institute, and U.S. Chamber of Commerce briefs). John's culpability should be considered against the backdrop of this evidence, which establishes that no industry actors thought at the time that the defendants' conduct was improper, much less unlawful.

Then, at trial, there was a stunning lack of contemporaneous evidence that anyone in 2009 (for example) thought that what Congress would later prohibit as "spoofing" was already illegal under the fraud statutes. The prosecution relied heavily on CME Rule 432 at trial to bolster its argument that spoofing was widely understood to be deceptive and wrong. But this Court held as

a matter of law before trial that Rule 432 was *ambiguous* as to whether it prohibited spoofing. Dkt. 596, at 239. If Rule 432 was ambiguous, then by definition a trader could have reasonably understood the Rule *not* to prohibit spoofing. And it was not until September 2014, nearly four years after the Dodd-Frank spoofing provision was enacted, that the CME published a rule explicitly stating that spoofing was prohibited—something that would have been superfluous if CME Rule 432 had already made that clear.

But even if CME Rule 432 clearly prohibited spoofing—and it did not—violating an exchange rule is itself not illegal, nor is it tantamount to fraud. *Cf. United States v. Finnerty*, 533 F.3d 143, 150 (2d Cir. 2008). And the government was unable to point to anyone—no regulators, compliance departments, individual traders, academics, Members of Congress, or anyone else—who had taken the position that spoofing was illegal or fraudulent before the effective date of Dodd-Frank. There is not a shred of public guidance, or even private guidance from compliance departments, pre-Dodd-Frank that specifically stated that spoofing was illegal. The cooperating witness's own testimony highlights this glaring evidentiary gap. He testified that no one in the bank compliance group *or anywhere else* ever told him that spoofing was wrong, Tr. 600, that he didn't remember any pre-Dodd-Frank compliance training ever mentioning spoofing, Tr. 904, 913, that he did not know of any incident where any trader anywhere was disciplined for spoofing prior to Dodd-Frank, Tr. 917, and that he didn't even remember CME Rule 432. Similarly, the government's witnesses from bank compliance departments—responsible for educating traders on market rules—disclaimed any knowledge of Rule 432 at trial. Tr. 1183, 1395. Even the Bloomberg chats the government emphasized so heavily at trial suggest that people in 2009 did not understand spoofing to be illegal: Supervisors are on the chats, Tr. 2204, and traders knew compliance was monitoring the chats, Tr. 1306-07. If, as the government claims, the chats show

open discussion about spoofing, it tends to show that the traders, supervisors, and compliance departments did not think it was illegal. Certainly, no one ever flagged John's trading as problematic in real time. While the government put forward witnesses at trial willing to retrospectively interpret Rule 432 and offer lay opinions that spoofing had always been illegal and in violation of exchange rules, there was not a shred of proof that John had been apprised of this interpretation of Rule 432 during the period at issue.

Also powerful is the legislative history and CFTC's prosecution history. In 2009, Gary Gensler, Chairman of the CFTC, testified before the Senate Committee on Agriculture. *See Reforming U.S. Financial Market Regulation*: Hearing before the S. Comm. on Agriculture, Nutrition, and Forestry, 111th Cong. 79-151 (2009), relevant excerpts attached as Ex. H. He explained that "[t]he CFTC and SEC … have jointly recommended that Congress act" to pass "legislation … to enhance the CFTC's enforcement authorities." *Id*. at 86. He opined "that certain practices are so disruptive to trading in the futures markets that they should be presumptively prohibited in statute." *Id.* When asked to clarify what specific practices he was referring to, the CFTC chairman stated: "The Commission supports efforts to ban certain disruptive practices such as … trading known as spoofing, that is, bidding or offering with the intent to cancel the bid or offer before execution." *Id*. at 151. The fact that the CFTC Commissioner in 2009 thought Congress needed to *ban* spoofing clearly shows he did not think it was already illegal.

Once Dodd-Frank passed and the anti-spoofing provision became law, the CFTC engaged in formal rulemaking to clarify the spoofing provision. 75 Fed. Reg. 67,301 (Nov. 2, 2010) (Advance Notice of Proposed Rulemaking). The CFTC invited comment on how the CFTC should define spoofing, and distinguish it from "the submission, modification, and cancelation of orders that may occur in the normal course of business." *Id*. at 67,302. The CFTC hosted a public

roundtable in December 2010 to discuss these issues, where commentors and panelists disagreed on the definition of spoofing. CFTC Staff Roundable on Disruptive Trading Practices (Dec. 2, 2010), attached as Ex. I. For example, one panelist wondered whether spoofing included "putting orders out that are taking risk." *Id*. at 111. Consistent with this remark, numerous industry participants submitted formal comments to the CFTC taking the position that placing real, at-risk orders—the precise conduct at issue here—was not understood to be, and should not be treated as, spoofing. 78 Fed. Reg. 31,890, 31,896 (May 28, 2013). Hindsight bias cannot ignore the genuine debate about the contours of prohibited trading practices both before and after Dodd-Frank.

For its part, the CME publicly took the position on two separate occasions after the enactment of Dodd-Frank that spoof orders did not create false impressions of supply or demand, precisely because all resting orders placed on the CME electronic platform are live and executable and thus reflect real supply or demand. As the trial evidence showed, the CME public positions on the issue were consistent with the definitions provided for bids, offers, supply, and demand in the public glossary of terms made available by the CME Education Department. Tr. 114-17.

Even after spoofing was prohibited by 7 U.S.C. § 6c(a)(5)(c), it was not clear spoofing was *fraud*. Again, the CFTC's views are particularly relevant: It took the position as recently as 2014 that spoofing was *not* fraudulent. *See U.S. Commodity Futures Trading Comm'n v. Wilson*, 27 F. Supp. 3d 517, 526, 532 (S.D.N.Y. 2014). *Wilson* was a civil enforcement action brought by the CFTC. The conduct described in the complaint was almost identical to that charged here: The defendants allegedly "developed and executed a manipulative scheme designed to influence the daily settlement rates of" futures contracts "by strategically placing electronic bids at higher interests rates than the [rate] that otherwise would control … and by subsequently withdrawing such bids shortly thereafter." Complaint ¶¶ 4–5, *Wilson*, No. 13 CIV 7884 (S.D.N.Y. Nov. 6,

2013); *see also id.* ¶ 48 (defendants "plac[ed] electronic bids" "and then quickly withdrew them"); *id.* ¶ 50 (bids were entered "for the purpose of affecting" rates). In *Wilson*, however, the CFTC took the position that the allegations in the complaint did "not sound in fraud." Response In Opposition to Motion to Dismiss at 48, *Wilson*, No. 13 CIV 7884 (S.D.N.Y. Jan. 31, 2014). The district court—conducting "a case-by-case evaluation" looking to the substance, not the label, of a claim—agreed that the CFTC's complaint did not sound in fraud. 27 F. Supp. 3d at 526. So even in 2014—at the end of the charged conduct in this case—the CFTC did not think spoofing was fraudulent.

The difficulty of apprehending the potential for spoof orders to be deemed fraudulent during the period in question becomes even more apparent after cataloging the various permissible order types and trading functionality that, at a minimum, share some of the same characteristics as spoof orders. In particular, as the trial evidence showed, the CME permitted (and continues to permit) all of the following trading techniques:

- <u>One-Cancels-the-Other</u>: this functionality allows traders to project two orders to the market with the intent of executing one order and cancelling the other order before execution. Similar to the alleged spoofing conduct at issue here, once the first order is executed, the other is cancelled. *See*, *e.g.*, Tr. 162–63.

- <u>Stop-Loss orders</u>: this invisible order type is often placed by traders with the expectation and hope that they will be cancelled before execution. Because stop orders do not appear in the visible order book, the supply or demand that they represent cannot be ascertained by other traders. *See*, *e.g.*, 262–64.

- <u>Fill-or-Kill orders</u>: this order type seeks an immediate fill at a desired price; otherwise, the entire order will be cancelled without anyone in the market ever knowing that it had been placed. *See*, *e.g.*, Tr. 160–62.

- <u>Iceberg or "Hidden Quantity" orders</u>: described as "automated camouflage" by the government's CME market witness, these order types allow traders to show less (and often far less) than the desired quantity of contracts they are seeking to buy or sell. *See*, *e.g.*, Tr. 158–59, 314. Although they unquestionably misrepresent the true state of supply and demand in the market, the CME regards icebergs as permissible and even desirable.

- Ping orders: these orders are placed to probe market depth and confirm the absence of iceberg orders without desire or intent to execute. In its roll out of Rule 575 in September 2014, the CME advised the market that the use of ping orders during pre-opening periods would be deemed violative of Rule 575, but the CME continues to permit them during open-market hours like the trading at issue here. *See*, *e.g.*, GX236 at 9-10.

While this Court and others in this Circuit have parsed certain of these order types and found grounds for distinguishing them from spoof orders, we respectfully submit that, even if spoof orders can be fairly construed as fraudulent, they are not far removed from other permissible order types and traders cannot be viewed too harshly for viewing them similarly, particularly in light of the dearth of available guidance on this subject at the relevant time.

In sum, John did not flout clear rules. His trading activity—which the cooperating witness testified was "easy to spot" and "easy to detect" for "anyone with even basic training," Tr. 831-32—was never flagged by compliance or led to a complaint of any kind. He was never told his conduct was unlawful or fraudulent. The only Rule the government can point to as notice that John's conduct was prohibited this Court found ambiguous. And at the time of the charged conduct, the CFTC was stating publicly that spoofing was not fraudulent and was not illegal. It was not until October 2014, when the indictment against Michael Coscia was first unsealed, that the public received specific notice that the government might regard spoof orders as a basis for fraud charges. In part for these reasons, the Chamber of Commerce, Bank Policy Institute, Futures Industry Association, and the Securities Industry and Financial Markets Association (SIFMA) all took the extraordinary step of filing amicus briefs in a criminal case supporting John's motion to dismiss the Indictment, arguing that the fraud statutes did not encompass "spoofing." Dkts. 158, 162-1. Further, in connection with the government's Santiago proffer, the Court received numerous declarations from industry experts and sophisticated trading firms establishing that they

still did not understand spoof orders to communicate any implicit representations, but only the express information reflected on the face of the actual orders. *See supra* at 47-48.

At most, creative lawyering has shown that John's conduct is technically within the reach of the fraud statutes, and thus that his intent to engage in that conduct can be deemed an intent to defraud. Even if the government were right on the law, and even if this application of the law did not violate due process—and we intend to argue otherwise on appeal—John's level of moral culpability is exceedingly low and unworthy of a custodial sentence.

**2. The Lack Of Financial Gain Weighs In Favor Of A Non-Custodial Sentence**

The government has never argued that John directly profited from the charged conduct in this case. The "gains" described above do not reflect money that went directly into John's pocket. To the contrary, John's trading was on behalf of his employers and their clients, *e.g.*, Tr. 631, 641, and so it was his employers and their clients that captured any financial gain—not John.

At trial, the government suggested that John nonetheless indirectly benefited from spoofing. They first claimed he received higher compensation for it in the form of bonuses. Tr. 1648–49. But when its own cooperating witness disavowed the economic value of spoofing, the government shifted to a new set of motives revolving around keeping his job and keeping clients happy. Tr. 643. In any event, there is no rational basis to conclude that spoofing resulted in financial gain for John.

In its loss calculation, the government points to 1,012 supposedly fraudulent episodes spanning six years, from 2009 to 2014. As explained above, this dramatically overstates the scope of relevant conduct for sentencing and losses attributed to said conduct for a variety of reasons. But even under the government's exaggerated parameters and flawed methodology, the profits attributable to spoofing on John's trades (i.e., losses to his counterparties) were $69,452. That's

roughly $70,000 over 1,012 episodes over six years, so less than $12,000 a year. Properly cabined to the trial episodes, the profits were $7,325 total, or about $1,200 a year.

To put those numbers in perspective, the options portfolio that John managed at BAML was worth *billions* of dollars. Tr. 1006-07. And in just the first quarter of 2009, BAML recorded *$536 million* in "sales and trading revenue from commodities." Reuters Staff, *BofA Commods Revenue Gets Big Boost from Merrill*, Reuters (Apr. 20, 2009), https://tinyurl.com/5ybvx5jz. The idea that John's bonus or employment status at BAML for his management of a multi-billion-dollar options portfolio for a company generating a half-billion dollars of revenue quarterly would be materially affected by a $1,200 or even $12,000 ill-gotten profit a year is beyond fanciful.

In sum, John derived virtually no benefit from the charged conduct, and that fact strongly favors a non-custodial sentence.

### B. John's Personal Characteristics Warrant Lenience

From the moment a group of FBI agents arrested John while he carried the recycling bin to the curb in front of his home on the morning of January 29, 2018, he has received unwavering support and love from his family and friends. Reconciling the man they know John to be against the statements made by the government and the press has been unbearably difficult at times, but those who truly know John stand by him resolutely—a testament to his long history of good character and the extraordinary support he has shown for others. The Court will of course review the outpouring of support embodied by the many letters submitted in support of John. Below, we highlight just a few common themes in the context of the § 3553 factors.

#### 1. John Exhibits A Remarkable Generosity Of Spirit, And A Custodial Sentence Would Impose Substantial Burdens On Those Who Depend On Him

First, John's generosity and selfless spirit is exceptional. His long-time friends and their families, people who have known John for decades, express a common theme: John has always

felt a deep sense of responsibility for those around him. He is selfless, putting others before himself and meeting whatever needs he can. *E.g.*, Ex. B-16; Ex. B-3; Ex. B-21. The extent of John's generosity cannot be overstated; he has readily and consistently shouldered the weight of the burdens carried by his friends and family in some of the darkest times of their lives, without a second thought. *E.g.*, Ex. B-16.

Examples, both big and small, abound. When a friend's son was struggling in school, many other kids and parents began to withdraw, but John kept close and remained a true friend. Ex. B-25. When John's father passed away, he had an outstanding construction obligation to the nuns of the Abbey of Regina Laudis. John was determined to fulfill that obligation, so he taught himself how to use his father's CAD engineering programs and blueprint printer and completed and delivered the required blueprints to the nuns. Ex. B-11. When a family member—an avid Red Socks fan—was in declining health, John planned a special family outing to Fenway Park to ensure the family could enjoy one last game together. Ex. B-21. When family members lost financial aid or had special needs public schools were unable to meet, John stepped up with tuition assistance. Ex. B-10. And on and on, that's what the letters show—selfless acts, without fanfare. Ex. B-26.

Through his generosity and selflessness, John has distinguished himself "by the amount of time that he has devoted" to those around him. *United States v. Serafini*, 233 F.3d 758, 775 (3d. Cir. 2000) (alterations omitted) (granting a downward departure based on defendant's actions that "were acts of giving time, of giving one's self."). Courts often recognize that small acts of kindness are as or more extraordinary than grandiose gestures or gifts. Indeed, "the focus should be on the defendant's activities … particularly those that go beyond the kind of 'impersonal writing of checks'…." *United States v. Mehta*, 307 F.Supp.2d 270, 277 (D. Mass 2004) (citing *Serafini,* 233 F.3d at 766); *see also United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006)

(imposing a below-Guidelines sentence where sentencing letters detailed "good deeds [that] were not performed to gain status or enhance [the defendant's] image."). That is exactly the kind of person John's letters of support show him to be. He puts in the work, going above and beyond to ensure that his loved ones feel loved and supported.

For many of these same reasons, John's family considers him to be the glue that holds the family together. Ex. B-2. While the loss of his income and retirement cushion has limited his ability to contribute financially to help extended family and friends, John offers his remaining resources: his company, time, energy, advice, praise, and manual labor. When a family member needed help preparing their home for sale, John drove over every weekend to help. Ex. B-18. When the family furnace malfunctioned—stumping even the HVAC repair person—John stayed up the entire night to diagnose the problem so his family would not have to endure another winter night without heat. Ex. B-3. He celebrates his children's accomplishments, dives into their hobbies, and consoles them when they are struggling, ultimately building up their confidence when they doubt themselves. *See e.g.*, Ex. B-1. And he does the same for other close family members. Ex. B-2.

There can be no doubt that John's absence would impose an enormous loss on his community, friends, and family—particularly his wife and three children. And those who know John best remain firm in their collective belief that John's resolve and spirit of service will allow him to continue rebuilding his life in a positive manner. The remarkable consistency with which John has dedicated himself to serving others weighs heavily in favor of leniency. He can do far more good for his family, friends, and the broader community if he is not incarcerated. These factors weigh against the imposition of a custodial sentence.

**2. John's Business Associates Know Him To Be Trustworthy And Ethical**

Along with family and friends, former colleagues and business associates have offered their voices of support of John. A common theme from this tranche of letters is clear: As noted above, John's former business associates know him to be a man of integrity, whose values served as a model for others in the workplace. *E.g.*, Ex. B-15. In sum, he is someone his colleagues wanted on their team. Ex. B-17. One even credits John with "instill[ing] a lifelong appreciation of the importance of integrity and honesty in [his colleagues'] dealings with the financial markets." Ex. B-23.

One letter in particular merits specific mention. Amrik Singh Sandhu, formerly John's direct supervisor at BAML and Morgan Stanley during the period at issue, wrote a letter in support of John. Over the last three decades, Mr. Sandhu has had the "fortunate experience of having almost every single type of professional relationship with [John], from competitor to team member, to customer, to supervisor." Ex. B-15. "John was not just a skilled and respected trader," according to Mr. Sandhu, "[h]e also held the highest ethical and cultural standards and was never afraid to stand up and demand people showed the same level of integrity that he himself exhibited effortlessly." *Id*

These letters illustrate that John's business associates—many of whom spent countless hours on the same trading desk—hold John in the highest regard and support him even now. Even if, as this Court has found, John's trading conduct falls within the reach of the fraud statutes, the 27 trading episodes where John fell short represent a blip on the radar against hundreds of thousands of trades over a 32-year career otherwise conducted with highest integrity.

### C. A Non-Custodial Sentence Provides Just Punishment and Adequate Deterrence

As the Court is aware, §3553(a) requires a sentence that provides just punishment and adequately deters future criminal conduct by the individual defendant (specific deterrence) and by society generally (general deterrence). Some collateral consequences, such as "[e]limination of the defendant's ability to engage in similar or related activities ... and the substantial loss of assets and income resulting from [conviction]" "constitute[] a source of both individual and general deterrence." *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993); *see also United States v. Redemann*, 295 F. Supp. 2d 887, 894 (E.D. Wis. 2003). Those factors are present here and demonstrate that a custodial sentence is not necessary for punishment or deterrence.

John lost his career, reputation, and no shortage of personal relationships—all of which he spent a lifetime working to build—as a direct consequence of this case. Even before his conviction, John lost numerous years of deferred compensation valued at $3 million—a financial penalty multiple times higher than the highest fine ever imposed on an individual for spoofing, and one that dwarfs the $1.5 million dollar fine paid by his most recent employer. He lost his securities registration and his benefits. He and his family spent nearly five years living in the shadow of this prosecution, infused with overwhelming stress and uncertainty, which has led to this moment: his sentence. He became isolated from his many friends and colleagues in his profession, some due to their potential roles as witnesses; others at the "suggestion" of their employers. Making matters worse, John and his family have been featured in media coverage they never invited, including, as just one example, a reporter who stalked the Pacilio children for years and used social media to obtain personal information and use the family's profile pictures. Irrespective of the merits of the government's case, John carries the weight of his family's suffering. In this context, his total

devotion to family and extraordinary capacity for empathy merely intensify John's personal grief over his family's ordeal and make his suffering more acute.

The stigma, public humiliation, loss of reputation, loss of career, the negative publicity, the loss of earning power, and the suffering of John's family serve as powerful reminders to the public of the serious consequences that arise from criminal prosecution. Sentencing John—a first-time, non-violent offender—to a term of custodial incarceration will not move the needle any further. *See United States v. Roth*, No. 05 CR 792-5, 2008 WL 686783 (N.D. Ill. Mar. 11, 2008) ("The publicity regarding [the defendant's] has obviously caused her great embarrassment and humiliation. Furthermore, [the defendant] has lost her law license as a result of this case. Therefore, a sentence of imprisonment to deter Roth and protect the public from further criminal conduct by her is unnecessary.").

Further, as noted elsewhere, the law has changed since most of the offense conduct. Congress has now intervened to outlaw spoofing, clarifying the ambiguity that prevailed under CME Rule 432 during the pre-Dodd-Frank era.[14] The government points to the effects of John's conduct on the integrity of financial markets and argues such conduct perpetuates the idea that the system is rigged. But there is no reason to think that punishing John—a manual trader in a sea of algorithms—will change anything about market integrity or how markets are perceived. And as another federal court recently explained, the government's premise is just wrong: Public perception about the financial markets reflect the unfair structural realities of those markets, not one-off convictions of individual traders. *See* Trial Transcript at 5, *United States v. Pinto-Thomaz*,

[14] As reflected in the PSR (at ¶ 22), the government conceded that Dodd-Frank clarified the rules about spoofing. Such clarification would not have been necessary if the rules were previously clear.

No. 18-cr-579 (S.D.N.Y. Apr. 16, 2019), ECF No. 127, at 5 ("[A]nyone who thinks that the stock market is a level playing field obviously [h]as no contact with reality.").

In sum, given the numerous other consequences of John's criminal conviction, *Roth*, 2008 WL 686783, including the loss of his livelihood and his family's suffering, a sentence of supervised release or, at most, home confinement, provides sufficient punishment for the offense conduct, which provided no tangential benefit to John. *See supra* at 54-55.

### D. A Sentence Of Home Confinement Is Consistent With Sentences Imposed On Similarly Situated Defendants And Therefore Avoids Unwarranted Sentencing Disparities.

18 U.S.C. § 3553(a)(6) directs this Court to consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." The majority of accused spoofers are never criminally charged at all; the government more often opts instead to levy a civil penalty. For those defendants who are charged, even when the Guidelines would impose a significant prison term, the overwhelming trend in spoofing cases is in favor of non-custodial sentences. And looking to both civil and criminal cases, the trend in the last year is even more stark: Of the five cases resolved in the last year, not a single one resulted in a custodial sentence.

A survey of recent spoofing cases reveals that defendants are much more likely to be assessed a civil monetary penalty than be criminally charged. Those penalties range from $100,000 to $750,000.[15] Penalties far in excess of those amounts have already been exacted as a

---

[15] These traders were Randy Chen, CFTC No. 22-35 (Sept. 26, 2022, $150,000); Eric Schwartz, CFTC No. 22-22 (Aug. 24, 2022, $100,000); Roman Banoczay, N.D. Ill. No. 20-cv-5777 (Dec. 7, 2021, $750,000); Rajeev Kansal, CFTC No. 20-73 (Sept. 30, 2020, $100,000); Wesley Johnson, CFTC No. 20-72 (Sept. 30, 2020, $100,000); Thomas Donino, CFTC No. 20-68 (Sept. 28, 2020, $135,000); Igor Chernomzav, CFTC No. 19-31 (Sept. 30, 2019, $750,000); John Lawrence, CFTC No. 19-27 (Sept. 16, 2019, $130,000); Benjamin Cox, CFTC No. 19-18 (July 31, 2019, $150,000); Anuj Singhal, CFTC No. 18-11 (Apr. 9, 2018, $150,000); Michael Franko, CFTC No. 18-35

result of the allegations in this case. First, John was required to forfeit $3 million in deferred compensation. Second, the banks for which John worked have paid $38 million to the government to resolve disputes arising from the conspiracy alleged here. *See* Dkt. 452, Exs. A-C. By any of these measures, John has been punished—and the government has been remunerated—far in excess of most similarly situated traders.

Even looking at the minority of traders who were criminally charged and convicted, the trend again is strongly in favor of non-custodial sentences. Indeed, that trend leans so decidedly against imprisonment that one district judge recently observed it "was striking." Stewart Bishop, *Ex-BofA Trader Avoids Prison for Spoofing Treasury Notes*, Law360 (July 28, 2022), https://tinyurl.com/4m8b7pb6 (reporting on *United States v. Forbes*, No. 22-cr-97 (E.D.N.Y.)). That judge, like so many of her peers, sentenced the defendant to time served. *Id.* Indeed, of the eleven defendants counsel have identified who were convicted of spoofing-related charges since 2016, the majority received non-custodial sentences, despite the fact that their Guidelines ranges exceeded 30 months in all but two instances.[16]

(Sept. 19, 2018, $500,000); Simon Posen, CFTC No. 17-20 (July 26, 2017, $635,000); Jonathan Brims, CFTC No. 17-13 (Mar. 30, 2017, $200,000); and Stephen Gola, CFTC No. 17-12 (Mar. 30, 2017, $350,000).

[16] *See United States v. Wang*, No. 22-cr-10123 (D. Mass. Nov. 30, 2022) (range not available, time served); *Forbes*, No. 22-cr-97 (E.D.N.Y. Aug. 2, 2022) (33-41 months range, time served); *United States v. Milrud*, No. 15-cr-455 (D.N.J. Apr. 24, 2022) (range not available, probation); *United States v. Liew*, No. 17-cr-1 (N.D. Ill. Nov. 17, 2021) (12-18 months range, time served); *United States v. Chanu*, No. 18-cr-35 (N.D. Ill. Aug. 26, 2021) (57-71 months range, one year and one day); *United States v. Gandhi*, No. 18-cr-609 (S.D. Tex. July 20, 2021) (87-108 months range, two years); *United States v. Mohan*, No. 18-cr-610 (S.D. Tex. July 19, 2021) (60 months range, probation); *United States v. Vorley*, No. 18-cr-35 (N.D. Ill. June 30, 2021) (57-71 months range, one year and one day); *United States v. Zhao*, No. 18-cr-24 (N.D. Ill. Feb. 4, 2020) (30-37 months range, time served); *United States v. Sarao*, No. 15-cr-75 (N.D. Ill. Jan. 29, 2020) (78-97 months range, time served); *United States v. Coscia*, No. 14-cr-551 (N.D. Ill. July 14, 2016) (70-87 months range, three years).

The government has conceded all of this. In a recent filing, the government acknowledged that "in recent years" there have been "numerous … cases" "involving … market manipulation conduct [that] ha[ve] been charged only by the SEC and not criminally." Government's Sentencing Memorandum at 14, *United States v. Wang*, No. 22-cr-10123 (D. Mass. Nov. 23, 2022), ECF No. 114, at 14. The government further agrees that, for those few cases "that have resolved criminally," courts have often imposed "sentences significantly below the guidelines sentencing ra[n]ge." *Id.*

The government will likely observe that three defendants in this District have received custodial sentences, but each of those instances is distinguishable: Mr. Vorley and Mr. Chanu engaged in ten times as many spoofing episodes as the government asserts against John, with alleged losses exceeding $1 million. Mr. Coscia used a sophisticated algorithm to implement his strategy and generate well in excess of $1 million dollars in profits in just over two months (and presumably many more millions in alleged losses under the government's current loss calculation methods). The district court also found that Mr. Coscia had obstructed justice with false testimony, an allegation absent from this case. The better comparisons are Mr. Milrud and Mr. Mohan, both of whom engaged in conduct far more extensive and complex than the government attributes to John, and both of whom were sentenced to probation.

Nor is it any answer that some of the cases cataloged above involved defendants who pleaded guilty. The two- or three-point downward adjustment for the acceptance of responsibility pales in comparison to the enhancements for loss, meaning that even factoring in their guilty pleas, these defendants typically faced Guidelines ranges comparable to or higher than John's. Yet those high ranges consistently yielded non-custodial sentences.

Take Jiali Wang, who over the course of five years "oversaw the manipulative trading activity" of at least eight co-conspirators and himself. Information, *Wang*, No. 22-cr-10123 (D. Mass July 29, 2022), ECF No. 104, ¶ 26. Wang was the ringleader of the conspiracy, which generated profits of over $8 million. Government's Sentencing Memorandum, *supra*, ECF No. 114, at 2; *see also id.* at 12 (describing Wang as "the leader of the scheme"). As a result of that enormous profit, Wang's offense level was increased by 18 points, with only a three-point decrease for the acceptance of responsibility. As a result, even factoring in the acceptance of responsibility, Wang's offense level exceeded by three points the level the government now urges for John.

Even though Wang faced a higher Guidelines range than the government urges here, the government agreed that Wang should be sentenced to time served and home confinement. *See* Government's Sentencing Memorandum, *supra*, No. 22-cr-10123, ECF No. 114, at 6, 15. That inconsistency cannot be explained by the acceptance of responsibility or the benefit to the government of avoiding trial, which were both factored into Wang's Guidelines range. *See* U.S.S.G. § 3E1.1. Nor can it be explained by the amount of money involved. In John's case, the government has not offered evidence of *any* gain at all. But even assuming there was some gain, Dr. Carr explains that it amounted to roughly $69,452 for all 1,012 episodes, and only about $7,000 if the inquiry is properly cabined to the trial episodes. *Supra* at 54-55 (citing Carr Decl. Ex. 2, *l.* 6a). Even the inflated figure is less than 1% of Wang's profit. The Court should consider the leniency the government has sought in these other cases, even when those cases involved dramatically more profit and greater culpability. And the Court should reject the notion that John deserves a disparately greater sentence simply because he put the government to its burden of proof. *See, e.g.*, *United States v. Moskovits*, 86 F.3d 1303, 1310 (3d Cir. 1996) ("We agree with

Moskovits that Judge Newcomer erred when he considered as a sentencing factor Moskovits's decision to exercise his constitutional right to a trial…."); *United States v. Bischel*, 61 F.3d 1429, 1437 (9th Cir. 1995) (warning against "sentencing disparit[ies] … due to an impermissible motive to punish [a defendant] for exercising his trial rights"); *United States v. Osmani*, 20 F.3d 266, 269 (7th Cir. 1994) ("Thus a sentencing judge may not impose a harsher sentence on a defendant who chooses to exercise his constitutional right to trial….").

Thus, imposing a sentence within the Guidelines calculation set forth by Probation and the government would generate unacceptable disparities with traders accused of similar (or worse) conduct and would fail to reflect the relative culpability of John in the context of those other traders' conduct.

**CONCLUSION**

The letters in support of John reveal a remarkably generous person who is giving with his time and energy in innumerable ways, never seeking thanks or expecting reciprocity. The fact that he exhibited such generosity over such a long period of time makes clear that his generosity of spirit is his true nature. He did not personally profit from the offense conduct. And while the Court has rejected our arguments that his conduct was not criminal as a matter of law, the circumstances at least show significantly reduced moral culpability given the ambiguity of the legal framework at the time of the offense. The Court should reject the government's inflated Guidelines calculation, but regardless of the resulting range, we respectfully urge the Court to impose a non-custodial sentence—either a period of supervised release or, at most, a modest period of home confinement—so that John can continue to forge a new life, to care for his family and friends, and to be an asset to society. Under the circumstances here, no purpose would be served by a term of incarceration.

Dated: December 16, 2022

Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP

By: /s/ *David H. McGill*
David H. McGill
James A. Flynn
1152 15th Street NW
Washington, DC 20005
(202) 339-8400
dmcgill@orrick.com
jflynn@orrick.com

Alyssa Barnard-Yanni
51 West 52nd Street
New York, NY 10019
(212) 506-5000
abarnard-yanni@orrick.com

*Counsel for Defendant John Pacilio*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 16, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will provide notice of the filing to counsel for the government.

/s/ *David H. McGill*
David H. McGill